(Slip Opinion)      OCTOBER TERM, 2004      1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## VAN ORDEN *v.* PERRY, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS AND CHAIRMAN, STATE PRESERVATION BOARD, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 03–1500.   Argued March 2, 2005—Decided June 27, 2005

Among the 21 historical markers and 17 monuments surrounding the Texas State Capitol is a 6-foot-high monolith inscribed with the Ten Commandments. The legislative record illustrates that, after accepting the monument from the Fraternal Order of Eagles—a national social, civic, and patriotic organization—the State selected a site for it based on the recommendation of the state organization that maintains the capitol grounds. Petitioner, an Austin resident who encounters the monument during his frequent visits to those grounds, brought this 42 U. S. C. §1983 suit seeking a declaration that the monument's placement violates the First Amendment's Establishment Clause and an injunction requiring its removal. Holding that the monument did not contravene the Clause, the District Court found that the State had a valid secular purpose in recognizing and commending the Eagles for their efforts to reduce juvenile delinquency, and that a reasonable observer, mindful of history, purpose, and context, would not conclude that this passive monument conveyed the message that the State endorsed religion. The Fifth Circuit affirmed.

*Held:* The judgment is affirmed.

351 F. 3d 173, affirmed.

THE CHIEF JUSTICE, joined by JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE THOMAS, concluded that the Establishment Clause allows the display of a monument inscribed with the Ten Commandments on the Texas State Capitol grounds. Reconciling the strong role played by religion and religious traditions throughout our Nation's history, see *School Dist. of Abington Township* v. *Schempp,* 374

U. S. 203, 212–213, with the principle that governmental interven-
tion in religious matters can itself endanger religious freedom re-
quires that the Court neither abdicate its responsibility to maintain a
division between church and state nor evince a hostility to religion,
*e.g., Zorach* v. *Clauson*, 343 U. S. 306, 313–314. While the Court has
sometimes pointed to *Lemon* v. *Kurtzman*, 403 U. S. 602, for the gov-
erning test, *Lemon* is not useful in dealing with the sort of passive
monument that Texas has erected on its capitol grounds. Instead,
the analysis should be driven by both the monument's nature and the
Nation's history. From at least 1789, there has been an unbroken
history of official acknowledgment by all three branches of govern-
ment of religion's role in American life. *Lynch* v. *Donnelly,* 465 U. S.
668, 674. Texas' display of the Commandments on government prop-
erty is typical of such acknowledgments. Representations of the
Commandments appear throughout this Court and its grounds, as
well as the Nation's Capital. Moreover, the Court's opinions, like its
building, have recognized the role the Decalogue plays in America's
heritage. See, *e.g.*, *McGowan* v. *Maryland,* 366 U. S. 420, 442, 462.
While the Commandments are religious, they have an undeniable
historical meaning. Simply having religious content or promoting a
message consistent with a religious doctrine does not run afoul of the
Establishment Clause. See, *e.g., Lynch* v. *Donnelly, supra*, at 680,
687. There are, of course, limits to the government's display of reli-
gious messages or symbols. For example, this Court held unconstitu-
tional a Kentucky statute requiring the posting of the Ten Com-
mandments in every public schoolroom. *Stone* v. *Graham,* 449 U. S.
39, 41–42. However, neither *Stone* itself nor subsequent opinions
have indicated that *Stone*'s holding would extend beyond the context
of public schools to a legislative chamber, see *Marsh* v. *Chambers,*
463 U. S. 783, or to capitol grounds. Texas' placement of the Com-
mandments monument on its capitol grounds is a far more passive
use of those texts than was the case in *Stone,* where the text con-
fronted elementary school students every day. Indeed, petitioner
here apparently walked by the monument for years before bringing
this suit. *Schempp, supra,* and *Lee* v. *Weisman*, 505 U. S. 577, dis-
tinguished. Texas has treated her capitol grounds monuments as
representing several strands in the State's political and legal history.
The inclusion of the Commandments monument in this group has a
dual significance, partaking of both religion and government, that
cannot be said to violate the Establishment Clause. Pp. 3–12.

   JUSTICE BREYER concluded that this is a difficult borderline case
where none of the Court's various tests for evaluating Establishment
Clause questions can substitute for the exercise of legal judgment.
See, *e.g., School Dist. of Abington Township* v. *Schempp,* 374 U. S. 203,

Syllabus

305 (Goldberg, J., concurring). That judgment is not a personal judgment. Rather, as in all constitutional cases, it must reflect and remain faithful to the underlying purposes of the First Amendment's Religion Clauses—to assure the fullest possible scope of religious liberty and tolerance for all, to avoid the religious divisiveness that promotes social conflict, and to maintain the separation of church and state. No exact formula can dictate a resolution to fact-intensive cases such as this. Despite the Commandments' religious message, an inquiry into the context in which the text of the Commandments is used demonstrates that the Commandments also convey a secular moral message about proper standards of social conduct and a message about the historic relation between those standards and the law. The circumstances surrounding the monument's placement on the capitol grounds and its physical setting provide a strong, but not conclusive, indication that the Commandments' text as used on this monument conveys a predominantly secular message. The determinative factor here, however, is that 40 years passed in which the monument's presence, legally speaking, went unchallenged (until the single legal objection raised by petitioner). Those 40 years suggest more strongly than can any set of formulaic tests that few individuals, whatever their belief systems, are likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to establish religion. See *ibid.* The public visiting the capitol grounds is more likely to have considered the religious aspect of the tablets' message as part of what is a broader moral and historical message reflective of a cultural heritage. For these reasons, the Texas display falls on the permissible side of the constitutional line. Pp. 1–8.

REHNQUIST, C. J., announced the judgment of the Court and delivered an opinion, in which SCALIA, KENNEDY, and THOMAS, JJ., joined. SCALIA, J., and THOMAS, J., filed concurring opinions. BREYER, J., filed an opinion concurring in the judgment. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined. O'CONNOR, J., filed a dissenting opinion. SOUTER, J., filed a dissenting opinion, in which STEVENS and GINSBURG, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 03–1500

———————

## THOMAS VAN ORDEN, PETITIONER *v.* RICK PERRY, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS AND CHAIRMAN, STATE PRESERVATION BOARD, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2005]

CHIEF JUSTICE REHNQUIST announced the judgment of the Court and delivered an opinion, in which JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE THOMAS join.

The question here is whether the Establishment Clause of the First Amendment allows the display of a monument inscribed with the Ten Commandments on the Texas State Capitol grounds. We hold that it does.

The 22 acres surrounding the Texas State Capitol contain 17 monuments and 21 historical markers commemorating the "people, ideals, and events that compose Texan identity." Tex. H. Con. Res. 38, 77th Leg. (2001).[1] The monolith challenged here stands 6-feet high and 3½-feet wide. It is located to the north of the Capitol building,

————————

[1] The monuments are: Heroes of the Alamo, Hood's Brigade, Confederate Soldiers, Volunteer Fireman, Terry's Texas Rangers, Texas Cowboy, Spanish-American War, Texas National Guard, Ten Commandments, Tribute to Texas School Children, Texas Pioneer Woman, The Boy Scouts' Statue of Liberty Replica, Pearl Harbor Veterans, Korean War Veterans, Soldiers of World War I, Disabled Veterans, and Texas Peace Officers.

between the Capitol and the Supreme Court building. Its primary content is the text of the Ten Commandments. An eagle grasping the American flag, an eye inside of a pyramid, and two small tablets with what appears to be an ancient script are carved above the text of the Ten Commandments. Below the text are two Stars of David and the superimposed Greek letters Chi and Rho, which represent Christ. The bottom of the monument bears the inscription "PRESENTED TO THE PEOPLE AND YOUTH OF TEXAS BY THE FRATERNAL ORDER OF EAGLES OF TEXAS 1961." App. to Pet. for Cert. 21.

The legislative record surrounding the State's acceptance of the monument from the Eagles—a national social, civic, and patriotic organization—is limited to legislative journal entries. After the monument was accepted, the State selected a site for the monument based on the recommendation of the state organization responsible for maintaining the Capitol grounds. The Eagles paid the cost of erecting the monument, the dedication of which was presided over by two state legislators.

Petitioner Thomas Van Orden is a native Texan and a resident of Austin. At one time he was a licensed lawyer, having graduated from Southern Methodist Law School. Van Orden testified that, since 1995, he has encountered the Ten Commandments monument during his frequent visits to the Capitol grounds. His visits are typically for the purpose of using the law library in the Supreme Court building, which is located just northwest of the Capitol building.

Forty years after the monument's erection and six years after Van Orden began to encounter the monument frequently, he sued numerous state officials in their official capacities under Rev. Stat. §1979, 42 U. S. C. §1983, seeking both a declaration that the monument's placement violates the Establishment Clause and an injunction requiring its removal. After a bench trial, the District

Court held that the monument did not contravene the Establishment Clause. It found that the State had a valid secular purpose in recognizing and commending the Eagles for their efforts to reduce juvenile delinquency. The District Court also determined that a reasonable observer, mindful of the history, purpose, and context, would not conclude that this passive monument conveyed the message that the State was seeking to endorse religion. The Court of Appeals affirmed the District Court's holdings with respect to the monument's purpose and effect. 351 F. 3d 173 (CA5 2003). We granted certiorari, 543 U. S. \_\_\_ (2004), and now affirm.

Our cases, Januslike, point in two directions in applying the Establishment Clause. One face looks toward the strong role played by religion and religious traditions throughout our Nation's history. As we observed in *School Dist. of Abington Township* v. *Schempp,* 374 U. S. 203 (1963):

> "It is true that religion has been closely identified with our history and government. . . . The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself. . . . It can be truly said, therefore, that today, as in the beginning, our national life reflects a religious people who, in the words of Madison, are 'earnestly praying, as . . . in duty bound, that the Supreme Law-giver of the Universe . . . guide them into every measure which may be worthy of his [blessing . . . .]' " *Id.*, at 212–213.[2]

The other face looks toward the principle that governmen-

_____

[2] See also *Engel* v. *Vitale,* 370 U. S. 421, 434 (1962) ("The history of man is inseparable from the history of religion"); *Zorach* v. *Clauson,* 343 U. S. 306, 313 (1952) ("We are a religious people whose institutions presuppose a Supreme Being").

tal intervention in religious matters can itself endanger religious freedom.

This case, like all Establishment Clause challenges, presents us with the difficulty of respecting both faces. Our institutions presuppose a Supreme Being, yet these institutions must not press religious observances upon their citizens. One face looks to the past in acknowledgment of our Nation's heritage, while the other looks to the present in demanding a separation between church and state. Reconciling these two faces requires that we neither abdicate our responsibility to maintain a division between church and state nor evince a hostility to religion by disabling the government from in some ways recognizing our religious heritage:

> "When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. . . . [W]e find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence." *Zorach* v. *Clauson,* 343 U. S. 306, 313–314 (1952).

See also *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819, 845–846 (1995) (warning against the "risk [of] fostering a pervasive bias or hostility to religion, which could undermine the very neutrality the Establishment Clause requires").[3]

---

[3] Despite JUSTICE STEVENS' recitation of occasional language to the

Opinion of REHNQUIST, C. J.

These two faces are evident in representative cases both upholding[4] and invalidating[5] laws under the Establish-

———————

contrary, *post*, at 4–5, and n. 7 (dissenting opinion), we have not, and do not, adhere to the principle that the Establishment Clause bars any and all governmental preference for religion over irreligion. See, *e.g.*, *Cutter* v. *Wilkinson*, 544 U. S. \_\_ (2005); *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U. S. 327 (1987); *Lynch* v. *Donnelly*, 465 U. S. 668 (1984); *Marsh* v. *Chambers,* 463 U. S. 783 (1983); *Walz* v. *Tax Comm'n of City of New York,* 397 U. S. 664 (1970). Even the dissenters do not claim that the First Amendment's Religion Clauses forbid all governmental acknowledgments, preferences, or accommodations of religion. See *post*, at 6 (opinion of STEVENS, J.) (recognizing that the Establishment Clause permits some "recognition" or "acknowledgment" of religion); *post*, at 5, and n. 4 (opinion of SOUTER, J.) (discussing a number of permissible displays with religious content).

[4] *Zelman* v. *Simmons-Harris*, 536 U. S. 639 (2002) (upholding school voucher program); *Good News Club* v. *Milford Central School,* 533 U. S. 98 (2001) (holding that allowing religious school groups to use school facilities does not violate the Establishment Clause); *Agostini* v. *Felton*, 521 U. S. 203 (1997) (approving a program that provided public employees to teach remedial classes at religious and other private schools), overruling *Aguilar* v. *Felton*, 473 U. S. 402 (1985) (barring public school teachers from going to parochial schools to provide remedial education to disadvantaged children), and *School Dist. of Grand Rapids* v. *Ball,* 473 U. S. 373 (1985) (striking down a program that provided classes to religious school students at public expense in classrooms leased from religious schools); *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995) (holding that the Establishment Clause does not bar disbursement of funds from student activity fees to religious organizations); *Zobrest* v. *Catalina Foothills School Dist.*, 509 U. S. 1 (1993) (allowing a public school district to provide a sign-language interpreter to a deaf student at a Catholic high school as part of a federal program for the disabled); *Lynch* v. *Donnelly, supra* (upholding a Christmas display including a crèche); *Marsh* v. *Chambers, supra* (upholding legislative prayer); *Mueller* v. *Allen*, 463 U. S. 388 (1983) (upholding tax deduction for certain expenses incurred in sending one's child to a religious school).

[5] *Santa Fe Independent School Dist.* v. *Doe*, 530 U. S. 290 (2000) (holding unconstitutional student-initiated and student-led prayer at school football games); *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet*, 512 U. S. 687 (1994) (invalidating a state law that created a

ment Clause. Over the last 25 years, we have sometimes pointed to *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), as providing the governing test in Establishment Clause challenges.[6]  Compare *Wallace* v. *Jaffree,* 472 U. S. 38 (1985) (applying *Lemon*), with *Marsh* v. *Chambers,* 463 U. S. 783 (1983) (not applying *Lemon*). Yet, just two years after *Lemon* was decided, we noted that the factors identified in *Lemon* serve as "no more than helpful signposts." *Hunt* v. *McNair,* 413 U. S. 734, 741 (1973). Many of our recent cases simply have not applied the *Lemon* test. See, *e.g.*, *Zelman* v. *Simmons-Harris,* 536 U. S. 639 (2002); *Good News Club* v. *Milford Central School,* 533 U. S. 98 (2001). Others have applied it only after concluding that the challenged practice was invalid under a different Establishment Clause test.

Whatever may be the fate of the *Lemon* test in the larger scheme of Establishment Clause jurisprudence, we think it not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds.

––––––––––

new school district for a single religious community); *Lee* v. *Weisman*, 505 U. S. 577 (1992) (prohibiting officially sponsored graduation prayers); *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573 (1989) (holding the display of a crèche in a courthouse unconstitutional but allowing the display of a menorah outside a county building); *Texas Monthly, Inc.* v. *Bullock*, 489 U. S. 1 (1989) (plurality opinion) (invalidating a sales tax exemption for all religious periodicals); *Edwards* v. *Aguillard*, 482 U. S. 578 (1987) (invalidating a law mandating the teaching of creationism if evolution was taught); *Estate of Thornton* v. *Caldor, Inc.*, 472 U. S. 703 (1985) (invalidating state law that gave employees an absolute right not to work on their Sabbath); *Wallace* v. *Jaffree*, 472 U. S. 38 (1985) (invalidating law mandating a daily minute of silence for meditation or voluntary prayer).

    [6] *Lemon* sets out a three-prong test: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" 403 U. S., at 612–613 (citation omitted).

Instead, our analysis is driven both by the nature of the monument and by our Nation's history.

As we explained in *Lynch* v. *Donnelly,* 465 U. S. 668 (1984): "There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Id.,* at 674. For example, both Houses passed resolutions in 1789 asking President George Washington to issue a Thanksgiving Day Proclamation to "recommend to the people of the United States a day of public thanksgiving and prayer, to be observed by acknowledging, with grateful hearts, the many and signal favors of Almighty God." 1 Annals of Cong. 90, 914. President Washington's proclamation directly attributed to the Supreme Being the foundations and successes of our young Nation:

> "Now, therefore, I do recommend and assign Thursday, the 26th day of November next, to be devoted by the people of these States to the service of that great and glorious Being who is the beneficent author of all the good that was, that is, or that will be; that we may then all unite in rendering unto Him our sincere and humble thanks for His kind care and protection of the people of this country previous to their becoming a nation; for the signal and manifold mercies and the favorable interpositions of His providence in the course and conclusion of the late war; for the great degree of tranquillity, union, and plenty which we have since enjoyed; for the peaceable and rational manner in which we have been enabled to establish constitutions of government for our safety and happiness, and particularly the national one now lately instituted; for the civil and religious liberty with which we are blessed, and the means we have of acquiring and diffusing useful knowledge; and, in general, for all the great and various favors which He has been pleased to confer

upon us." 1 J. Richardson, Messages and Papers of the Presidents, 1789–1897, p. 64 (1899).

Recognition of the role of God in our Nation's heritage has also been reflected in our decisions. We have acknowledged, for example, that "religion has been closely identified with our history and government," *School Dist. of Abington Township* v. *Schempp,* 374 U. S., at 212, and that "[t]he history of man is inseparable from the history of religion," *Engel* v. *Vitale,* 370 U. S. 421, 434 (1962).[7] This recognition has led us to hold that the Establishment Clause permits a state legislature to open its daily sessions with a prayer by a chaplain paid by the State. *Marsh* v. *Chambers*, 463 U. S., at 792.[8] Such a practice, we thought, was "deeply embedded in the history and tradition of this country." *Id.*, at 786. As we observed there, "it would be incongruous to interpret [the Establishment Clause] as imposing more stringent First Amendment limits on the states than the draftsmen imposed on the Federal Government." *Id.*, at 790–791. With similar reasoning, we have upheld laws, which originated from one of the Ten Commandments, that prohibited the sale of merchandise on Sunday. *McGowan* v. *Maryland,* 366 U. S. 420, 431–440 (1961); see *id.*, at 470–488 (separate opinion

---

[7] See also *Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1, 26 (2004) (REHNQUIST, C. J., concurring in judgment) ("Examples of patriotic invocations of God and official acknowledgments of religion's role in our Nation's history abound"); *id.*, at 35–36 (O'CONNOR, J., concurring in judgment) ("It is unsurprising that a Nation founded by religious refugees and dedicated to religious freedom should find references to divinity in its symbols, songs, mottoes, and oaths"); *Lynch* v. *Donnelly,* 465 U. S., at 675 ("Our history is replete with official references to the value and invocation of Divine guidance").

[8] Indeed, we rejected the claim that an Establishment Clause violation was presented because the prayers had once been offered in the Judeo-Christian tradition: In *Marsh*, the prayers were often explicitly Christian, but the chaplain removed all references to Christ the year after the suit was filed. 463 U. S., at 793–794, and n. 14.

of Frankfurter, J.).

In this case we are faced with a display of the Ten Commandments on government property outside the Texas State Capitol. Such acknowledgments of the role played by the Ten Commandments in our Nation's heritage are common throughout America. We need only look within our own Courtroom. Since 1935, Moses has stood, holding two tablets that reveal portions of the Ten Commandments written in Hebrew, among other lawgivers in the south frieze. Representations of the Ten Commandments adorn the metal gates lining the north and south sides of the Courtroom as well as the doors leading into the Courtroom. Moses also sits on the exterior east facade of the building holding the Ten Commandments tablets.

Similar acknowledgments can be seen throughout a visitor's tour of our Nation's Capital. For example, a large statue of Moses holding the Ten Commandments, alongside a statue of the Apostle Paul, has overlooked the rotunda of the Library of Congress' Jefferson Building since 1897. And the Jefferson Building's Great Reading Room contains a sculpture of a woman beside the Ten Commandments with a quote above her from the Old Testament (Micah 6:8). A medallion with two tablets depicting the Ten Commandments decorates the floor of the National Archives. Inside the Department of Justice, a statue entitled "The Spirit of Law" has two tablets representing the Ten Commandments lying at its feet. In front of the Ronald Reagan Building is another sculpture that includes a depiction of the Ten Commandments. So too a 24-foot-tall sculpture, depicting, among other things, the Ten Commandments and a cross, stands outside the federal courthouse that houses both the Court of Appeals and the District Court for the District of Columbia. Moses is also prominently featured in the Chamber of the United

States House of Representatives.[9]

Our opinions, like our building, have recognized the role the Decalogue plays in America's heritage. See, *e.g.*, *McGowan* v. *Maryland,* 366 U. S., at 442; *id.*, at 462 (separate opinion of Frankfurter, J.).[10] The Executive and Legislative Branches have also acknowledged the historical role of the Ten Commandments. See, *e.g.*, Public Papers of the Presidents, Harry S. Truman, 1950, p. 157 (1965); S. Con. Res. 13, 105th Cong., 1st Sess. (1997); H. Con. Res. 31, 105th Cong., 1st Sess. (1997). These displays and recognitions of the Ten Commandments bespeak the rich American tradition of religious acknowledgments.

Of course, the Ten Commandments are religious—they were so viewed at their inception and so remain. The monument, therefore, has religious significance. According to Judeo-Christian belief, the Ten Commandments were given to Moses by God on Mt. Sinai. But Moses was a lawgiver as well as a religious leader. And the Ten

───────────

[9] Other examples of monuments and buildings reflecting the prominent role of religion abound. For example, the Washington, Jefferson, and Lincoln Memorials all contain explicit invocations of God's importance. The apex of the Washington Monument is inscribed "Laus Deo," which is translated to mean "Praise be to God," and multiple memorial stones in the monument contain Biblical citations. The Jefferson Memorial is engraved with three quotes from Jefferson that make God a central theme. Inscribed on the wall of the Lincoln Memorial are two of Lincoln's most famous speeches, the Gettysburg Address and his Second Inaugural Address. Both inscriptions include those speeches' extensive acknowledgments of God. The first federal monument, which was accepted by the United States in honor of sailors who died in Tripoli, noted the dates of the fallen sailors as "the year of our Lord, 1804, and in the 28 year of the independence of the United States."

[10] See also *Edwards* v. *Aguillard,* 482 U. S., at 593–594; *Lynch* v. *Donnelly,* 465 U. S., at 677–678; *id.*, at 691 (O'CONNOR, J., concurring); *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S., at 652–653 (STEVENS, J., concurring in part and dissenting in part); *Stone* v. *Graham,* 449 U. S. 39, 45 (1980) (REHNQUIST, J., dissenting).

Commandments have an undeniable historical meaning, as the foregoing examples demonstrate. Simply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause. See *Lynch* v. *Donnelly*, 465 U. S., at 680, 687; *Marsh* v. *Chambers,* 463 U. S., at 792; *McGowan* v. *Maryland*, *supra*, at 437–440; *Walz* v. *Tax Comm'n of City of New York,* 397 U. S. 664, 676–678 (1970).

There are, of course, limits to the display of religious messages or symbols. For example, we held unconstitutional a Kentucky statute requiring the posting of the Ten Commandments in every public schoolroom. *Stone* v. *Graham,* 449 U. S. 39 (1980) *(per curiam).* In the classroom context, we found that the Kentucky statute had an improper and plainly religious purpose. *Id.*, at 41. As evidenced by *Stone*'s almost exclusive reliance upon two of our school prayer cases, *id.*, at 41–42 (citing *School Dist. of Abington Township* v. *Schempp,* 374 U. S. 203 (1963), and *Engel* v. *Vitale,* 370 U. S. 421 (1962)), it stands as an example of the fact that we have "been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools," *Edwards* v. *Aguillard,* 482 U. S. 578, 583–584 (1987). Compare *Lee* v. *Weisman,* 505 U. S. 577, 596–597 (1992) (holding unconstitutional a prayer at a secondary school graduation), with *Marsh* v. *Chambers, supra* (upholding a prayer in the state legislature). Indeed, *Edwards* v. *Aguillard* recognized that *Stone*—along with *Schempp* and *Engel*—was a consequence of the "particular concerns that arise in the context of public elementary and secondary schools." 482 U. S., at 584–585. Neither *Stone* itself nor subsequent opinions have indicated that *Stone*'s holding would extend to a legislative chamber, see *Marsh* v. *Chambers, supra*, or to capitol grounds.[11]

--------

[11] Nor does anything suggest that *Stone* would extend to displays of

The placement of the Ten Commandments monument on the Texas State Capitol grounds is a far more passive use of those texts than was the case in *Stone,* where the text confronted elementary school students every day. Indeed, Van Orden, the petitioner here, apparently walked by the monument for a number of years before bringing this lawsuit. The monument is therefore also quite different from the prayers involved in *Schempp* and *Lee* v. *Weisman.* Texas has treated her Capitol grounds monuments as representing the several strands in the State's political and legal history. The inclusion of the Ten Commandments monument in this group has a dual significance, partaking of both religion and government. We cannot say that Texas' display of this monument violates the Establishment Clause of the First Amendment.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

––––––––––

the Ten Commandments that lack a "plainly religious," "pre-eminent purpose," *id.,* at 41. See *Edwards* v. *Aguillard, supra*, at 593–594 ("*[Stone]* did not mean that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization"). Indeed, we need not decide in this case the extent to which a primarily religious purpose would affect our analysis because it is clear from the record that there is no evidence of such a purpose in this case.

# SUPREME COURT OF THE UNITED STATES

---

No. 03–1500

---

## THOMAS VAN ORDEN, PETITIONER *v.* RICK PERRY, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS AND CHAIRMAN, STATE PRESERVATION BOARD, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2005]

JUSTICE SCALIA, concurring.

I join the opinion of THE CHIEF JUSTICE because I think it accurately reflects our current Establishment Clause jurisprudence—or at least the Establishment Clause jurisprudence we currently apply some of the time. I would prefer to reach the same result by adopting an Establishment Clause jurisprudence that is in accord with our Nation's past and present practices, and that can be consistently applied—the central relevant feature of which is that there is nothing unconstitutional in a State's favoring religion generally, honoring God through public prayer and acknowledgment, or, in a nonproselytizing manner, venerating the Ten Commandments. See *McCreary County* v. *American Civil Liberties Union of Ky.*, *post*, at 1–11 (SCALIA, J., dissenting).

# SUPREME COURT OF THE UNITED STATES

_____

No. 03–1500

_____

## THOMAS VAN ORDEN, PETITIONER *v.* RICK PERRY, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS AND CHAIRMAN, STATE PRESERVATION BOARD, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2005]

JUSTICE THOMAS, concurring.

The Court holds that the Ten Commandments monument found on the Texas State Capitol grounds does not violate the Establishment Clause. Rather than trying to suggest meaninglessness where there is meaning, THE CHIEF JUSTICE rightly recognizes that the monument has "religious significance." *Ante*, at 10. He properly recognizes the role of religion in this Nation's history and the permissibility of government displays acknowledging that history. *Ante*, at 6–8. For those reasons, I join THE CHIEF JUSTICE's opinion in full.

This case would be easy if the Court were willing to abandon the inconsistent guideposts it has adopted for addressing Establishment Clause challenges,* and return to the original meaning of the Clause. I have previously

_____

*See, *e.g.*, *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 592–594 (1989) (employing endorsement test); *Lemon* v. *Kurtzman*, 403 U. S. 602, 612–613 (1971) (setting forth three-pronged test); *Marsh* v. *Chambers,* 463 U. S. 783, 790–792 (1983) (upholding legislative prayer due to its "unique history"); see also *Lynch* v. *Donnelly*, 465 U. S. 668, 679–681 (1984) ("[W]e have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area").

suggested that the Clause's text and history "resis[t] incorporation" against the States. See *Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1, 46, (2004) (opinion concurring in judgment); see also *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 677–680, and n. 3 (2002) (opinion concurring). If the Establishment Clause does not restrain the States, then it has no application here, where only state action is at issue.

Even if the Clause is incorporated, or if the Free Exercise Clause limits the power of States to establish religions, see *Cutter* v. *Wilkinson,* 544 U. S. ___ , ___, n. 3 (2005) (slip op., at 3, n. 3) (THOMAS, J., concurring), our task would be far simpler if we returned to the original meaning of the word "establishment" than it is under the various approaches this Court now uses. The Framers understood an establishment "necessarily [to] involve actual legal coercion." *Newdow*, *supra*, at 52 (THOMAS, J., concurring in judgment); *Lee* v. *Weisman,* 505 U. S. 577, 640 (1992) (SCALIA, J., dissenting) ("The coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy and of financial support *by force of law and threat of penalty*"). "In other words, establishment at the founding involved, for example, mandatory observance or mandatory payment of taxes supporting ministers." *Cutter, supra,* at ___ (slip op., at 4) (THOMAS, J., concurring). And "government practices that have nothing to do with creating or maintaining . . . coercive state establishments" simply do not "implicate the possible liberty interest of being free from coercive state establishments." *Newdow*, *supra*, at 53 (THOMAS, J., concurring in judgment).

There is no question that, based on the original meaning of the Establishment Clause, the Ten Commandments display at issue here is constitutional. In no sense does Texas compel petitioner Van Orden to do anything. The only injury to him is that he takes offense at seeing the

monument as he passes it on his way to the Texas Supreme Court Library. He need not stop to read it or even to look at it, let alone to express support for it or adopt the Commandments as guides for his life. The mere presence of the monument along his path involves no coercion and thus does not violate the Establishment Clause.

Returning to the original meaning would do more than simplify our task. It also would avoid the pitfalls present in the Court's current approach to such challenges. This Court's precedent elevates the trivial to the proverbial "federal case," by making benign signs and postings subject to challenge. Yet even as it does so, the Court's precedent attempts to avoid declaring all religious symbols and words of longstanding tradition unconstitutional, by counterfactually declaring them of little religious significance. Even when the Court's cases recognize that such symbols have religious meaning, they adopt an unhappy compromise that fails fully to account for either the adherent's or the nonadherent's beliefs, and provides no principled way to choose between them. Even worse, the incoherence of the Court's decisions in this area renders the Establishment Clause impenetrable and incapable of consistent application. All told, this Court's jurisprudence leaves courts, governments, and believers and nonbelievers alike confused—an observation that is hardly new. See *Newdow, supra*, at 45, n. 1 (THOMAS, J., concurring in judgment) (collecting cases).

First, this Court's precedent permits even the slightest public recognition of religion to constitute an establishment of religion. For example, individuals frequenting a county courthouse have successfully challenged as an Establishment Clause violation a sign at the courthouse alerting the public that the building was closed for Good Friday and containing a 4-inch high crucifix. *Granzeier* v. *Middleton*, 955 F. Supp. 741, 743, and n. 2, 746–747 (ED Ky. 1997), aff'd on other grounds, 173 F. 3d 568, 576 (CA6

1999).  Similarly, a park ranger has claimed that a cross erected to honor World War I veterans on a rock in the Mojave Desert Preserve violated the Establishment Clause, and won.  See *Buono* v. *Norton*, 212 F. Supp. 2d 1202, 1204–1205, 1215–1217 (CD Cal. 2002).  If a cross in the middle of a desert establishes a religion, then no religious observance is safe from challenge.  Still other suits have charged that city seals containing religious symbols violate the Establishment Clause.  See, *e.g.*, *Robinson* v. *Edmond*, 68 F. 3d 1226 (CA10 1995); *Murray* v. *Austin*, 947 F. 2d 147 (CA5 1991); *Friedman* v. *Board of Cty. Comm'rs of Bernalillo Cty.*, 781 F. 2d 777 (CA10 1985) (en banc).  In every instance, the litigants are mere "[p]assersby . . . free to ignore [such symbols or signs], or even to turn their backs, just as they are free to do when they disagree with any other form of government speech." *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 664 (1989) (KENNEDY, J., concurring in part and dissenting in part).

Second, in a seeming attempt to balance out its willingness to consider almost any acknowledgment of religion an establishment, in other cases Members of this Court have concluded that the term or symbol at issue has no religious meaning by virtue of its ubiquity or rote ceremonial invocation.  See, *e.g.*, *id.*, at 630–631 (O'CONNOR, J., concurring); *Lynch* v. *Donnelly,* 465 U. S. 668, 716–717 (1984) (Brennan, J., dissenting).  But words such as "God" have religious significance.  For example, just last Term this Court had before it a challenge to the recitation of the Pledge of Allegiance, which includes the phrase "one Nation under God."  The declaration that our country is "'one Nation under God'" necessarily "entail[s] an affirmation that God exists."  *Newdow, supra,* at 48 (THOMAS, J., concurring in judgment).  This phrase is thus anathema to those who reject God's existence and a validation of His existence to those who accept it.  Telling either nonbe-

lievers or believers that the words "under God" have no meaning contradicts what they know to be true. Moreover, repetition does not deprive religious words or symbols of their traditional meaning. Words like "God" are not vulgarities for which the shock value diminishes with each successive utterance.

Even when this Court's precedents recognize the religious meaning of symbols or words, that recognition fails to respect fully religious belief or disbelief. This Court looks for the meaning to an observer of indeterminate religious affiliation who knows all the facts and circumstances surrounding a challenged display. See, *e.g.*, *Capitol Square Review and Advisory Bd.* v. *Pinette,* 515 U. S. 753, 780 (1995) (O'CONNOR, J., concurring) (presuming that a reasonable observer is "aware of the history and context of the community and forum in which the religious display appears"). In looking to the view of this unusually informed observer, this Court inquires whether the sign or display "sends the ancillary message to . . . nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'" *Santa Fe Independent School Dist.* v. *Doe,* 530 U. S. 290, 309–310 (2000) (quoting *Lynch, supra,* at 688 (O'CONNOR, J., concurring)).

This analysis is not fully satisfying to either nonadherents or adherents. For the nonadherent, who may well be more sensitive than the hypothetical "reasonable observer," or who may not know all the facts, this test fails to capture completely the honest and deeply felt offense he takes from the government conduct. For the adherent, this analysis takes no account of the message sent by removal of the sign or display, which may well appear to him to be an act hostile to his religious faith. The Court's foray into religious meaning either gives insufficient weight to the views of nonadherents and adherents alike,

or it provides no principled way to choose between those views. In sum, this Court's effort to assess religious meaning is fraught with futility.

Finally, the very "flexibility" of this Court's Establishment Clause precedent leaves it incapable of consistent application. See *Edwards* v. *Aguillard*, 482 U. S. 578, 640 (1987) (SCALIA, J., dissenting) (criticizing the *Lemon* test's "flexibility" as "the absence of any principled rationale" (internal quotation marks omitted)). The inconsistency between the decisions the Court reaches today in this case and in *McCreary County* v. *American Civil Liberties Union of Ky.*, *post*, p. —, only compounds the confusion.

The unintelligibility of this Court's precedent raises the further concern that, either in appearance or in fact, adjudication of Establishment Clause challenges turns on judicial predilections. See, *e.g.*, *Harris* v. *Zion, Lake Cty., Ill.*, 927 F. 2d 1401, 1425 (CA7 1991) (Easterbrook, J., dissenting) ("Line drawing in this area will be erratic and heavily influenced by the personal views of the judges"); *post*, at 3 (BREYER, J., concurring in judgment) ("I see no test-related substitute for the exercise of legal judgment"). The outcome of constitutional cases ought to rest on firmer grounds than the personal preferences of judges.

Much, if not all, of this would be avoided if the Court would return to the views of the Framers and adopt coercion as the touchstone for our Establishment Clause inquiry. Every acknowledgment of religion would not give rise to an Establishment Clause claim. Courts would not act as theological commissions, judging the meaning of religious matters. Most important, our precedent would be capable of consistent and coherent application. While the Court correctly rejects the challenge to the Ten Commandments monument on the Texas Capitol grounds, a more fundamental rethinking of our Establishment Clause jurisprudence remains in order.

# SUPREME COURT OF THE UNITED STATES

No. 03–1500

THOMAS VAN ORDEN, PETITIONER *v.* RICK PERRY,
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS
AND CHAIRMAN, STATE PRESERVATION
BOARD, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2005]

JUSTICE BREYER, concurring in the judgment.

In *School Dist. of Abington Township* v. *Schempp,* 374 U. S. 203 (1963), Justice Goldberg, joined by Justice Harlan, wrote, in respect to the First Amendment's Religion Clauses, that there is "no simple and clear measure which by precise application can readily and invariably demark the permissible from the impermissible." *Id.*, at 306 (concurring opinion). One must refer instead to the basic purposes of those Clauses. They seek to "assure the fullest possible scope of religious liberty and tolerance for all." *Id.*, at 305. They seek to avoid that divisiveness based upon religion that promotes social conflict, sapping the strength of government and religion alike. *Zelman* v. *Simmons-Harris,* 536 U. S. 639, 717–729 (2002) (BREYER, J., dissenting). They seek to maintain that "separation of church and state" that has long been critical to the "peaceful dominion that religion exercises in [this] country," where the "spirit of religion" and the "spirit of freedom" are productively "united," "reign[ing] together" but in separate spheres "on the same soil." A. de Tocqueville, Democracy in America 282–283 (1835) (H. Mansfield & D. Winthrop transls. and eds. 2000). They seek to further the basic principles set forth today by JUSTICE O'CONNOR in

her concurring opinion in *McCreary County* v. *American Civil Liberties Union of Ky.*, *post,* at 1.

The Court has made clear, as Justices Goldberg and Harlan noted, that the realization of these goals means that government must "neither engage in nor compel religious practices," that it must "effect no favoritism among sects or between religion and nonreligion," and that it must "work deterrence of no religious belief." *Schempp, supra,* at 305 (concurring opinion); see also *Lee* v. *Weisman,* 505 U. S. 577, 587 (1992); *Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1, 15–16 (1947). The government must avoid excessive interference with, or promotion of, religion. See generally *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 593–594 (1989); *Zelman*, *supra*, at 723–725 (BREYER, J., dissenting). But the Establishment Clause does not compel the government to purge from the public sphere all that in any way partakes of the religious. See, *e.g.*, *Marsh* v. *Chambers,* 463 U. S. 783 (1983). Such absolutism is not only inconsistent with our national traditions, see, *e.g.*, *Lemon* v. *Kurtzman,* 403 U. S. 602, 614 (1971); *Lynch* v. *Donnelly*, 465 U. S. 668, 672–678 (1984), but would also tend to promote the kind of social conflict the Establishment Clause seeks to avoid.

Thus, as Justices Goldberg and Harlan pointed out, the Court has found no single mechanical formula that can accurately draw the constitutional line in every case. See *Schempp*, 374 U. S., at 306 (concurring opinion). Where the Establishment Clause is at issue, tests designed to measure "neutrality" alone are insufficient, both because it is sometimes difficult to determine when a legal rule is "neutral," and because

> "untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolve-

ment with the religious which the Constitution com-
mands, but of a brooding and pervasive devotion to
the secular and a passive, or even active, hostility to
the religious." *Ibid.*

Neither can this Court's other tests readily explain the
Establishment Clause's tolerance, for example, of the
prayers that open legislative meetings, see *Marsh, supra;*
certain references to, and invocations of, the Deity in the
public words of public officials; the public references to
God on coins, decrees, and buildings; or the attention paid
to the religious objectives of certain holidays, including
Thanksgiving. See, *e.g.*, *Lemon, supra*, at 612–613 (setting
forth what has come to be known as the "*Lemon* test");
*Lynch, supra*, at 687 (O'CONNOR, J., concurring) (setting
forth the "endorsement test"); *Capitol Square Review and
Advisory Bd.* v. *Pinette*, 515 U. S. 753, 800, n. 5 (1995)
(STEVENS, J., dissenting) (agreeing that an "endorsement
test" should apply but criticizing its "reasonable observer"
standard); *Santa Fe Independent School Dist.* v. *Doe*, 530
U. S. 290, 319 (2000) (REHNQUIST, C. J., dissenting) (not-
ing *Lemon*'s "checkered career in the decisional law of this
Court"); *County of Allegheny, supra*, at 655–656 (KENNEDY,
J., joined by REHNQUIST, C. J., and White and SCALIA, JJ.,
concurring in judgment in part and dissenting in part)
(criticizing the *Lemon* test).

If the relation between government and religion is one of
separation, but not of mutual hostility and suspicion, one
will inevitably find difficult borderline cases. And in such
cases, I see no test-related substitute for the exercise of
legal judgment. See *Schempp, supra*, at 305 (Goldberg, J.,
concurring); cf. *Zelman, supra*, at 726–728 (BREYER, J.,
dissenting) (need for similar exercise of judgment where
quantitative considerations matter). That judgment is not
a personal judgment. Rather, as in all constitutional
cases, it must reflect and remain faithful to the underlying

purposes of the Clauses, and it must take account of context and consequences measured in light of those purposes. While the Court's prior tests provide useful guideposts—and might well lead to the same result the Court reaches today, see, *e.g.*, *Lemon, supra,* at 612–613; *Capitol Square, supra*, at 773–783 (O'CONNOR, J., concurring in part and concurring in judgment)—no exact formula can dictate a resolution to such fact-intensive cases.

The case before us is a borderline case. It concerns a large granite monument bearing the text of the Ten Commandments located on the grounds of the Texas State Capitol. On the one hand, the Commandments' text undeniably has a religious message, invoking, indeed emphasizing, the Diety. On the other hand, focusing on the text of the Commandments alone cannot conclusively resolve this case. Rather, to determine the message that the text here conveys, we must examine how the text is *used*. And that inquiry requires us to consider the context of the display.

In certain contexts, a display of the tablets of the Ten Commandments can convey not simply a religious message but also a secular moral message (about proper standards of social conduct). And in certain contexts, a display of the tablets can also convey a historical message (about a historic relation between those standards and the law)—a fact that helps to explain the display of those tablets in dozens of courthouses throughout the Nation, including the Supreme Court of the United States. See generally App. to Brief for United States as *Amicus Curiae* 1a–7a.

Here the tablets have been used as part of a display that communicates not simply a religious message, but a secular message as well. The circumstances surrounding the display's placement on the capitol grounds and its physical setting suggest that the State itself intended the latter, nonreligious aspects of the tablets' message to predominate. And the monument's 40-year history on the Texas

state grounds indicates that that has been its effect.

The group that donated the monument, the Fraternal Order of Eagles, a private civic (and primarily secular) organization, while interested in the religious aspect of the Ten Commandments, sought to highlight the Commandments' role in shaping civic morality as part of that organization's efforts to combat juvenile delinquency. See 1961 Tex. Gen. Laws 1995. The Eagles' consultation with a committee composed of members of several faiths in order to find a nonsectarian text underscores the group's ethics-based motives. See Brief for Respondents 5–6, and n. 9. The tablets, as displayed on the monument, prominently acknowledge that the Eagles donated the display, a factor which, though not sufficient, thereby further distances the State itself from the religious aspect of the Commandments' message.

The physical setting of the monument, moreover, suggests little or nothing of the sacred. See Appendix A, *infra.* The monument sits in a large park containing 17 monuments and 21 historical markers, all designed to illustrate the "ideals" of those who settled in Texas and of those who have lived there since that time. Tex. H. Con. Res. 38, 77th Leg. (2001); see Appendix B, *infra.* The setting does not readily lend itself to meditation or any other religious activity. But it does provide a context of history and moral ideals. It (together with the display's inscription about its origin) communicates to visitors that the State sought to reflect moral principles, illustrating a relation between ethics and law that the State's citizens, historically speaking, have endorsed. That is to say, the context suggests that the State intended the display's moral message—an illustrative message reflecting the historical "ideals" of Texans—to predominate.

If these factors provide a strong, but not conclusive, indication that the Commandments' text on this monument conveys a predominantly secular message, a further

factor is determinative here. As far as I can tell, 40 years passed in which the presence of this monument, legally speaking, went unchallenged (until the single legal objection raised by petitioner). And I am not aware of any evidence suggesting that this was due to a climate of intimidation. Hence, those 40 years suggest more strongly than can any set of formulaic tests that few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to favor a particular religious sect, primarily to promote religion over nonreligion, to "engage in" any "religious practic[e]," to "compel" any "religious practic[e]," or to "work deterrence" of any "religious belief." *Schempp,* 374 U. S., at 305 (Goldberg, J., concurring). Those 40 years suggest that the public visiting the capitol grounds has considered the religious aspect of the tablets' message as part of what is a broader moral and historical message reflective of a cultural heritage.

This case, moreover, is distinguishable from instances where the Court has found Ten Commandments displays impermissible. The display is not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state. See, *e.g., Weisman,* 505 U. S., at 592; *Stone* v. *Graham,* 449 U. S. 39 (1980) *(per curiam)*. This case also differs from *McCreary County*, where the short (and stormy) history of the courthouse Commandments' displays demonstrates the substantially religious objectives of those who mounted them, and the effect of this readily apparent objective upon those who view them. See, *post,* at 21–25 (opinion of the Court). That history there indicates a governmental effort substantially to promote religion, not simply an effort primarily to reflect, historically, the secular impact of a religiously inspired document. And, in today's world, in a Nation of so many different religious and comparable nonreligious funda-

mental beliefs, a more contemporary state effort to focus attention upon a religious text is certainly likely to prove divisive in a way that this longstanding, pre-existing monument has not.

For these reasons, I believe that the Texas display—serving a mixed but primarily nonreligious purpose, not primarily "advanc[ing]" or "inhibit[ing] religion," and not creating an "excessive government entanglement with religion,"—might satisfy this Court's more formal Establishment Clause tests. *Lemon*, 403 U. S., at 612–613 (internal quotation marks omitted); see also *Capitol Square*, 515 U. S., at 773–783 (O'CONNOR, J., concurring in part and concurring in judgment). But, as I have said, in reaching the conclusion that the Texas display falls on the permissible side of the constitutional line, I rely less upon a literal application of any particular test than upon consideration of the basic purposes of the First Amendment's Religion Clauses themselves. This display has stood apparently uncontested for nearly two generations. That experience helps us understand that as a practical matter of *degree* this display is unlikely to prove divisive. And this matter of degree is, I believe, critical in a borderline case such as this one.

At the same time, to reach a contrary conclusion here, based primarily upon on the religious nature of the tablets' text would, I fear, lead the law to exhibit a hostility toward religion that has no place in our Establishment Clause traditions. Such a holding might well encourage disputes concerning the removal of longstanding depictions of the Ten Commandments from public buildings across the Nation. And it could thereby create the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid. *Zelman*, 536 U. S., at 717–729 (BREYER, J., dissenting).

Justices Goldberg and Harlan concluded in *Schempp* that

> "[t]he First Amendment does not prohibit practices which by any realistic measure create none of the dangers which it is designed to prevent and which do not so directly or substantially involve the state in religious exercise or in the favoring of religion as to have meaningful and practical impact." 374 U. S., at 308 (concurring opinion).

That kind of practice is what we have here. I recognize the danger of the slippery slope. Still, where the Establishment Clause is at issue, we must "distinguish between real threat and mere shadow." *Ibid.* Here, we have only the shadow.

In light of these considerations, I cannot agree with today's plurality's analysis. See, *e.g.*, *ante,* at 3–4, n. 3, 6–9. Nor can I agree with JUSTICE SCALIA's dissent in *McCreary County, post*, at 1. I do agree with JUSTICE O'CONNOR's statement of principles in *McCreary County, post*, at 1, though I disagree with her evaluation of the evidence as it bears on the application of those principles to this case.

I concur in the judgment of the Court.

APPENDIX A TO OPINION OF BREYER, J.



Red Arrow = Ten Commandments Monument

15th Street

John Reagan Building

T.W.C. Building

T.W.C. Annex

Colorado Street

Brazos Street

14
15
12
13

14th Street

14th Street

Tom Clark Building

Supreme Court Bldg.

11
10
9

H

Sam Houston Building

17
16

H

13th Street

CAPITOL

H

H

H

8

H

H

1

Brazos Street

State Library & Archives

H

7
H

H

H

Colorado Street

6

H
H
5
2

H

H

H

12th Street

H

Capitol Visitors Center

Insurance Building

4
3
H
H

H

11th Street

**Capitol Monument Guide**

1. Hood's Brigade
2. Heroes of the Alamo
3. Confederate Soldiers
4. Volunteer Firemen
5. Terry's Texas Rangers
6. Texas Cowboy
7. "The Hiker"
8. 36th Infantry
9. Ten Commandments
10. Tribute to Texas Children
11. Texas Pioneer Woman
12. Statue of Liberty Replica
13. Pearl Harbor Veterans
14. Korean War Veterans
15. Soldiers of World War I
16. Disabled Veterans
17. Texas Peace Officers

H = Historical Marker



NORTH

EXHIBIT
47
A-01-CA-833-H

NOTE: The diagram above has been simplified for clarity and does not accurately reflect all details of the actual grounds.

SPB:dry:GuideMonuments.cdr:10-01-00

# SUPREME COURT OF THE UNITED STATES

_____

No. 03–1500

_____

THOMAS VAN ORDEN, PETITIONER *v.* RICK PERRY,
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS
AND CHAIRMAN, STATE PRESERVATION
BOARD, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2005]

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, dissenting.

The sole function of the monument on the grounds of Texas' State Capitol is to display the full text of one version of the Ten Commandments. The monument is not a work of art and does not refer to any event in the history of the State. It is significant because, and only because, it communicates the following message:

"I AM the LORD thy God.

"Thou shalt have no other gods before me.

"Thou shalt not make to thyself any graven images.

"Thou shalt not take the Name of the Lord thy God in vain.

"Remember the Sabbath day, to keep it holy.

"Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.

"Thou shalt not kill.

"Thou shalt not commit adultery.

"Thou shalt not steal.

"Thou shalt not bear false witness against thy neighbor.

"Thou shalt not covet thy neighbor's house.

"Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything

that is thy neighbor's."  See Appendix, *infra.*[1]

Viewed on its face, Texas' display has no purported connection to God's role in the formation of Texas or the founding of our Nation; nor does it provide the reasonable observer with any basis to guess that it was erected to honor any individual or organization.  The message transmitted by Texas' chosen display is quite plain: This State endorses the divine code of the "Judeo-Christian" God.

For those of us who learned to recite the King James version of the text long before we understood the meaning of some of its words, God's Commandments may seem like wise counsel.  The question before this Court, however, is whether it is counsel that the State of Texas may proclaim without violating the Establishment Clause of the Constitution.  If any fragment of Jefferson's metaphorical "wall of separation between church and State"[2] is to be preserved—if there remains any meaning to the "wholesome 'neutrality' of which this Court's [Establishment Clause] cases speak," *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 222 (1963)—a negative answer to that question is mandatory.

I

In my judgment, at the very least, the Establishment Clause has created a strong presumption against the display of religious symbols on public property.  See, *e.g., County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 650 (1989) (STEVENS, J., concurring in part and dissenting in part); *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515

—————

[1] At the bottom of the message, the observer learns that the display was "[p]resented to the people and youth of Texas by the Fraternal Order of Eagles of Texas" in 1961.  See Appendix, *infra.*

[2] *Reynolds* v. *United States*, 98 U. S. 145, 164 (1879); see also *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 16 (1947).

U. S. 753, 797 (1995) (STEVENS, J., dissenting). The adornment of our public spaces with displays of religious symbols and messages undoubtedly provides comfort, even inspiration, to many individuals who subscribe to particular faiths. Unfortunately, the practice also runs the risk of "offend[ing] nonmembers of the faith being advertised as well as adherents who consider the particular advertisement disrespectful." *Allegheny County*, 492 U. S., at 651 (STEVENS, J., concurring in part and dissenting in part).[3]

Government's obligation to avoid divisiveness and exclusion in the religious sphere is compelled by the Establishment and Free Exercise Clauses, which together erect a wall of separation between church and state.[4] This metaphorical wall protects principles long recognized and often recited in this Court's cases. The first and most fundamental of these principles, one that a majority of this Court today affirms, is that the Establishment Clause demands religious neutrality—government may not exercise a preference for one religious faith over another. See,

───────────

[3] As Senator Danforth recently reminded us, "efforts to haul references of God into the public square, into schools and courthouses, are far more apt to divide Americans than to advance faith." Danforth, Onward, Moderate Christian Soldiers, N. Y. Times, June 17, 2005, p. A27.

[4] The accuracy and utility of this metaphor have been called into question. See, *e.g., Wallace* v. *Jaffree*, 472 U. S. 38, 106 (1985) (REHNQUIST, J., dissenting); see generally P. Hamburger, Separation of Church and State (2002). Whatever one may think of the merits of the historical debate surrounding Jefferson and the "wall" metaphor, this Court at a minimum has never questioned the concept of the "separation of church and state" in our First Amendment jurisprudence. THE CHIEF JUSTICE's opinion affirms that principle. *Ante*, at 4 (demanding a "separation between church and state"). Indeed, even the Court that famously opined that "[w]e are a religious people whose institutions presuppose a Supreme Being," *Zorach* v. *Clauson*, 343 U. S. 306, 313 (1952), acknowledged that "[t]here cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated," *id.*, at 312. The question we face is how to give meaning to that concept of separation.

*e.g., McCreary County* v. *American Civil Liberties Union, Ky.*, *post*, at 27–29.[5]  This essential command, however, is not merely a prohibition against the government's differentiation among religious sects.   We have repeatedly reaffirmed that neither a State nor the Federal Government "can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs."  *Torcaso* v. *Watkins*, 367 U. S. 488, 495 (1961) (footnote omitted).[6]  This principle is based on the straightforward notion that governmental promotion of orthodoxy is not saved by the aggregation of several orthodoxies under the State's banner.  See *Abington*, 374 U. S., at 222.

———————

[5] There is now widespread consensus on this principle.  See *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 15 (1947) ("Neither a state nor the Federal Government . . . can pass laws which aid one religion, aid all religions, or prefer one religion over another"); *School District of Abington Township* v. *Schempp*, 374 U. S. 203, 226 (1963) ("In the relationship between man and religion, the State is firmly committed to a position of neutrality"); *Larson* v. *Valente*, 456 U. S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another"); see also *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet,* 512 U. S. 687, 748 (1994) (SCALIA, J., dissenting) ("I have always believed . . . that the Establishment Clause prohibits the favoring of one religion over others"); but see *Church of Holy Trinity* v. *United States,* 143 U. S. 457, 470–471 (1892).

[6] In support of this proposition, the *Torcaso* Court quoted James Iredell, who in the course of debating the adoption of the Federal Constitution in North Carolina, stated: "'it is objected that the people of America may perhaps choose representatives who have no religion at all, and that Pagans and Mahometans may be admitted into offices.  But how is it possible to exclude any set of men, without taking away that principle of religious freedom which we ourselves so warmly contend for?'" 367 U. S., at 495, n. 10 (quoting 4 J. Elliot, Debates in the Several State Conventions on the Adoption of the Federal Constitution 197 (1836 ed.)).

Acknowledgments of this broad understanding of the neutrality principle are legion in our cases.[7]  Strong arguments to the contrary have been raised from time to time, perhaps the strongest in then-JUSTICE REHNQUIST's scholarly dissent in *Wallace* v. *Jaffree*, 472 U. S. 38, 91–114 (1985).[8]  Powerful as his argument was, we squarely rejected it and thereby reaffirmed the principle that the Establishment Clause requires the same respect for the atheist as it does for the adherent of a Christian faith.  As we wrote, "the Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embodies the right to select any religious faith or none at all."  *Id.*, at 52–53.

In restating this principle, I do not discount the importance of avoiding an overly strict interpretation of the metaphor so often used to define the reach of the Establishment Clause.  The plurality is correct to note that "religion and religious traditions" have played a "strong role . . . throughout our nation's history."  *Ante*, at 3.  This Court has often recognized "an unbroken history of official acknowledgment . . . of the role of religion in American life."  *Lynch* v. *Donnelly*, 465 U. S. 668, 674 (1984); accord,

--------

[7] See *Everson*, 330 U. S., at 18 (the Establishment Clause "requires the state to be . . . neutral in its relations with groups of religious believers and non-believers"); *Abington*, 374 U. S., at 216 (rejecting the proposition that the Establishment Clause "forbids only governmental preference of one religion over another"); *Wallace*, 472 U. S., at 52–55 (the interest in "forestalling intolerance extends beyond intolerance among Christian sects—or even intolerance among 'religions'—to encompass intolerance of the disbeliever and the uncertain"); cf. *Zorach*, 343 U. S., at 325 (Jackson, J., dissenting) ("The day that this country ceases to be free for irreligion it will cease to be free for religion—except for the sect that can win political power").

[8] JUSTICE SCALIA's dissent in the other Ten Commandments case we decide today, see *McCreary County* v. *American Civil Liberties Union of Ky.*, *post*, at 1–11, raises similar objections.  I address these objections directly in Part III.

*Edwards* v. *Aguillard*, 482 U. S. 578, 606–608 (1987)
(Powell, J., concurring). Given this history, it is unsur-
prising that a religious symbol may at times become an
important feature of a familiar landscape or a reminder of
an important event in the history of a community. The
wall that separates the church from the State does not
prohibit the government from acknowledging the religious
beliefs and practices of the American people, nor does it
require governments to hide works of art or historic
memorabilia from public view just because they also have
religious significance.

This case, however, is not about historic preservation or
the mere recognition of religion. The issue is obfuscated
rather than clarified by simplistic commentary on the
various ways in which religion has played a role in Ameri-
can life, see *ante,* at 3–8 (plurality opinion), and by the
recitation of the many extant governmental "acknowledg-
ments" of the role the Ten Commandments played in our
Nation's heritage.[9] *Ante*, at 8–9, and n. 8. Surely, the
mere compilation of religious symbols, none of which
includes the full text of the Commandments and all of

———————

[9] Though this Court has subscribed to the view that the Ten Com-
mandments influenced the development of Western legal thought, it
has not officially endorsed the far more specific claim that the Ten
Commandments played a significant role in the development of our
Nation's foundational documents (and the subsidiary implication that it
has special relevance to Texas). Although it is perhaps an overstate-
ment to characterize this latter proposition as "idiotic," see Tr. of Oral
Arg. 34, as one Member of the *plurality* has done, at the very least the
question is a matter of intense scholarly debate. Compare Brief for
Legal Historians and Law Scholars as *Amicus Curiae* in *McCreary
County* v. *American Civil Liberties Union of Ky.*, O. T. 2004, No. 03–
1693, with Brief for American Center for Law and Justice as *Amici
Curiae*. Whatever the historical accuracy of the proposition, the Dis-
trict Court categorically rejected respondent's suggestion that the
State's actual purpose in displaying the Decalogue was to signify its
influence on secular law and Texas institutions. App. to Pet. for Cert.
A–32.

which are exhibited in different settings, has only marginal relevance to the question presented in this case.

The monolith displayed on Texas Capitol grounds cannot be discounted as a passive acknowledgment of religion, nor can the State's refusal to remove it upon objection be explained as a simple desire to preserve a historic relic. This Nation's resolute commitment to neutrality with respect to religion is flatly inconsistent with the plurality's wholehearted validation of an official state endorsement of the message that there is one, and only one, God.

## II

When the Ten Commandments monument was donated to the State of Texas in 1961, it was not for the purpose of commemorating a noteworthy event in Texas history, signifying the Commandments' influence on the development of secular law, or even denoting the religious beliefs of Texans at that time. To the contrary, the donation was only one of over a hundred largely identical monoliths, and of over a thousand paper replicas, distributed to state and local governments throughout the Nation over the course of several decades. This ambitious project was the work of the Fraternal Order of Eagles, a well-respected benevolent organization whose good works have earned the praise of several Presidents.[10]

As the story goes, the program was initiated by the late Judge E. J. Ruegemer, a Minnesota juvenile court judge and then-Chairman of the Eagles National Commission on Youth Guidance. Inspired by a juvenile offender who had

---

[10] See Brief for Fraternal Order of Eagles as *Amicus Curiae* 2–3. The Order was formed in 1898 by six Seattle theater owners, promptly joined by actors, playwrights, and stagehands, and rapidly expanded to include a nationwide membership numbering over a million. *Id.*, at 2; see also *Fraternal Order of Eagles* v. *Grand Aerie of Fraternal Order of Eagles*, 148 Wash. 2d 224, 229, 59 P. 3d 655, 657 (2002) (en banc); *Lahmann* v. *Grand Aerie of Fraternal Order of Eagles*, 180 Ore. App. 420, 422, 43 P. 3d 1130, 1131 (2002).

never heard of the Ten Commandments, the judge ap-
proached the Minnesota Eagles with the idea of distribut-
ing paper copies of the Commandments to be posted in
courthouses nationwide. The State's Aerie undertook this
project and its popularity spread. When Cecil B. DeMille,
who at that time was filming the movie The Ten Com-
mandments, heard of the judge's endeavor, he teamed up
with the Eagles to produce the type of granite monolith
now displayed in front of the Texas Capitol and at court-
house squares, city halls, and public parks throughout the
Nation. Granite was reportedly chosen over DeMille's
original suggestion of bronze plaques to better replicate
the original Ten Commandments.[11]

The donors were motivated by a desire to "inspire the
youth" and curb juvenile delinquency by providing chil-
dren with a "code of conduct or standards by which to
govern their actions."[12] It is the Eagles' belief that dis-
seminating the message conveyed by the Ten Command-
ments will help to persuade young men and women to
observe civilized standards of behavior, and will lead to
more productive lives. Significantly, although the Eagles'
organization is nonsectarian, eligibility for membership is
premised on a belief in the existence of a "Supreme Be-
ing."[13] As described by the Eagles themselves:

––––––––

[11] See *Books* v. *Elkhart*, 235 F. 3d 292, 294–295 (CA7 2000); *State* v.
*Freedom from Religion Foundation, Inc.*, 898 P. 2d 1013, 1017 (Colo.
1995) (en banc); see also U. S. Supreme Court will hear Ten Com-
mandments Case in Early 2005, http://www.foe.com/tencommandments/
index.html (all Internet materials as visited June 24, 2005, and avail-
able in Clerk of Court's case file).

[12] *Freedom from Religion Foundation*, 898 P. 2d, at 1017; accord, 1961
Tex. Gen. Laws 1995 ("These plaques and monoliths have been pre-
sented by the Eagles to promote youth morality and to help stop the
alarming increase in delinquency"); Brief for Fraternal Order of Eagles
as *Amicus Curiae* 4.

[13] According to its articles of incorporation, the Eagles' purpose is to:
"'Unite fraternally for mutual benefit, protection, improvement, social

"'in searching for a youth guidance program, [we] rec-
ognized that there can be no better, no more defined
program of Youth Guidance, and adult guidance as
well, than the laws handed down by God Himself to
Moses more than 3000 years ago, which laws have
stood unchanged through the years. They are a fun-
damental part of our lives, the basis of all our laws for
living, the foundation of our relationship with our
Creator, with our families and with our fellow men.
All the concepts we live by—freedom, democracy, jus-
tice, honor—are rooted in the Ten Commandments.

.          .          .          .          .

"'The erection of these monoliths is to inspire all who
pause to view them, with a renewed respect for the
law of God, which is our greatest strength against the
forces that threaten our way of life.'" *Anderson* v.
*Salt Lake City Corp.*, 348 F. Supp. 1170, 1172 (Utah
1972), rev'd, 475 F. 2d 29 (CA10 1973).

The desire to combat juvenile delinquency by providing
guidance to youths is both admirable and unquestionably
secular. But achieving that goal through biblical teach-
ings injects a religious purpose into an otherwise secular
endeavor. By spreading the word of God and converting
heathens to Christianity, missionaries expect to enlighten
their converts, enhance their satisfaction with life, and
improve their behavior. Similarly, by disseminating the
"law of God"—directing fidelity to God and proscribing
murder, theft, and adultery—the Eagles hope that this
divine guidance will help wayward youths conform their

————————

enjoyment and association, all persons of good moral character who
believe in a Supreme Being to inculcate the principles of liberty, truth,
justice and equality . . .'" *Fraternal Order of Eagles*, 148 Wash. 2d, at
229, 59 P. 3d, at 657. See also Aerie Membership Application–Fraternal
Order of Eagles http://www.foe.com/membership/applications/aerie.html
("I, being of sound body and mind, and believing in the existence of a
Supreme Being . . .").

behavior and improve their lives. In my judgment, the significant secular by-products that are intended consequences of religious instruction—indeed, of the establishment of most religions—are not the type of "secular" purposes that justify government promulgation of sacred religious messages.

Though the State of Texas may genuinely wish to combat juvenile delinquency, and may rightly want to honor the Eagles for their efforts, it cannot effectuate these admirable purposes through an explicitly religious medium. See *Bowen* v. *Kendrick*, 487 U. S. 589, 639–640 (1988) (Blackmun, J., dissenting) ("It should be undeniable by now that religious dogma may not be employed by government even to accomplish laudable secular purposes"). The State may admonish its citizens not to lie, cheat or steal, to honor their parents and to respect their neighbors' property; and it may do so by printed words, in television commercials, or on granite monuments in front of its public buildings. Moreover, the State may provide its schoolchildren and adult citizens with educational materials that explain the important role that our forebears' faith in God played in their decisions to select America as a refuge from religious persecution, to declare their independence from the British Crown, and to conceive a new Nation. See *Edwards*, 482 U. S., at 606–608 (Powell, J., concurring). The message at issue in this case, however, is fundamentally different from either a bland admonition to observe generally accepted rules of behavior or a general history lesson.

The reason this message stands apart is that the Decalogue is a venerable religious text.[14] As we held 25 years

———————
[14] In *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573 (1989)*,* I noted that certain displays of religious images may convey "an equivocal message, perhaps of respect for Judaism, for religion in general, or for law." *Id.*, at 652 (opinion concurring in part and dissenting in part). It is rather mis-

ago, it is beyond dispute that "[t]he Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths." *Stone* v. *Graham*, 449 U. S. 39, 41 (1980) *(per curiam)* (footnote omitted). For many followers, the Commandments represent the literal word of God as spoken to Moses and repeated to his followers after descending from Mount Sinai. The message conveyed by the Ten Commandments thus cannot be analogized to an appendage to a common article of commerce ("In God we Trust") or an incidental part of a familiar recital ("God save the United States and this honorable Court"). Thankfully, the plurality does not attempt to minimize the religious significance of the Ten Commandments. *Ante*, at 10 ("Of course, the Ten Commandments are religious—they were so viewed at their inception and so remain"); *ante*, at 1 (THOMAS, J., concurring); see also *McCreary County* v. *American Civil Liberties Union of Ky.*, *post*, at 19 (SCALIA, J., dissenting). Attempts to secularize what is unquestionably a sacred text defy credibility and disserve people of faith.

The profoundly sacred message embodied by the text inscribed on the Texas monument is emphasized by the especially large letters that identify its author: "I AM the LORD thy God." See Appendix, *infra*. It commands present worship of Him and no other deity. It directs us to be guided by His teaching in the current and future conduct of all of our affairs. It instructs us to follow a code of divine law, some of which has informed and been integrated into our secular legal code ("Thou shalt not kill"), but much of which has not ("Thou shalt not make to thyself any graven images. . . . Thou shalt not covet").

Moreover, despite the Eagles' best efforts to choose a

---

leading, however, to quote my comment in that case to imply that I was referring to the text of the Ten Commandments *simpliciter*. See *McCreary County*, *post*, at 13–14.

benign nondenominational text,[15] the Ten Commandments
display projects not just a religious, but an inherently
sectarian message. There are many distinctive versions of
the Decalogue, ascribed to by different religions and even
different denominations within a particular faith; to a
pious and learned observer, these differences may be of
enormous religious significance.[16]  See Lubet, The Ten
Commandments in Alabama, 15 Constitutional Commen-
tary 471, 474–476 (Fall 1998).  In choosing to display this

—————

[15] See *ante*, at 5 (BREYER, J., concurring in judgment).  Despite the
Eagles' efforts, not all of the monuments they donated in fact conform
to a "universally-accepted" text.  Compare, *e.g.*, Appendix, *infra* (includ-
ing the command that "Thou shalt not make to thyself any graven
images"), and *Adland* v. *Russ*, 307 F. 3d 471, 475 (CA6 2002) (same),
with *Freedom from Religion Foundation*, 898 P. 2d, at 1016 (omitting
that command altogether).  The distinction represents a critical divide
between the Protestant and Catholic faiths.  During the Reformation,
Protestants destroyed images of the Virgin Mary and of Jesus Christ
that were venerated in Catholic churches. Even today there is a notable
difference between the imagery in different churches, a difference that
may in part be attributable to differing understandings of the meaning
of what is the Second Commandment in the King James Bible transla-
tion and a portion of the First Commandment in the Catholic transla-
tion.  See Finkelman, The Ten Commandments on the Courthouse
Lawn and Elsewhere, 73 Ford. L. Rev. 1477, 1493–1494 (2005).

[16] For example, in the Jewish version of the Sixth Commandment God
commands: "You shall not murder"; whereas, the King James interpre-
tation of the same command is: "Thou shalt not kill."  Compare W.
Plaut, The Torah: A Modern Commentary 534 (1981), with Appendix,
*infra*.  The difference between the two versions is not merely semantic;
rather, it is but one example of a deep theological dispute.  See Finkel-
man, *supra*, at 1481–1500; P. Maier, Enumerating the Decalogue; Do
We Number the Ten Commandments Correctly?  16 Concordia J. 18,
18–26 (1990).  Varying interpretations of this Commandment explain
the actions of vegetarians who refuse to eat meat, pacifists who refuse
to work for munitions makers, prison officials who refuse to administer
lethal injections to death row inmates, and pharmacists who refuse to
sell morning-after pills to women.  See Finkelman, *supra*, at 1494–
1496; Brief for American Jewish Congress et al. as *Amici Curiae* 22–23.
Although the command is ambiguous, its power to motivate likeminded
interpreters of its message cannot be denied.

version of the Commandments, Texas tells the observer that the State supports this side of the doctrinal religious debate. The reasonable observer, after all, has no way of knowing that this text was the product of a compromise, or that there is a rationale of any kind for the text's selection.[17]

The Establishment Clause, if nothing else, forbids government from "specifying details upon which men and women who believe in a benevolent, omnipotent Creator and Ruler of the world are known to differ." *Lee* v. *Weisman*, 505 U. S. 577, 641 (1992) (SCALIA, J., dissenting). Given that the chosen text inscribed on the Ten Commandments monument invariably places the State at the center of a serious sectarian dispute, the display is unquestionably unconstitutional under our case law. See *Larson* v. *Valente*, 456 U. S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another").

Even if, however, the message of the monument, despite the inscribed text, fairly could be said to represent the belief system of all Judeo-Christians, it would still run afoul of the Establishment Clause by prescribing a compelled code of conduct from one God, namely a Judeo-Christian God, that is rejected by prominent polytheistic sects, such as Hinduism, as well as nontheistic religions, such as Buddhism.[18] See, *e.g., Allegheny County*, 492

---

[17] JUSTICE SCALIA's willingness to dismiss the distinct textual versions adhered to by different faiths in the name of generic "monotheism" based on mere speculation regarding their significance, *McCreary County, post*, at 19, is not only somewhat ironic, see A. Scalia, A Matter of Interpretation 23–25 (1997), but also serves to reinforce the concern that interjecting government into the religious sphere will offend "adherents who consider the particular advertisement disrespectful." *Allegheny County*, 492 U. S., at 651 (STEVENS, J., concurring in part and dissenting in part).

[18] See Brief for Hindu American Foundation et al. as *Amici Curiae.*

U. S., at 615 (opinion of Blackmun, J.) ("The simultaneous
endorsement of Judaism and Christianity is no less consti-
tutionally infirm than the endorsement of Christianity
alone"). And, at the very least, the text of the Ten Com-
mandments impermissibly commands a preference for
religion over irreligion. See, *e.g., id.*, at 590 (The Estab-
lishment Clause "guarantee[s] religious liberty and equal-
ity to the 'infidel, the atheist, or the adherent of a non-
Christian faith such as Islam or Judaism'" (quoting *Wal-
lace*, 472 U. S., at 52)). Any of those bases, in my judg-
ment, would be sufficient to conclude that the message
should not be proclaimed by the State of Texas on a per-
manent monument at the seat of its government.

I do not doubt that some Texans, including those elected
to the Texas Legislature, may believe that the statues
displayed on the Texas Capitol grounds, including the Ten
Commandments monument, reflect the "ideals . . . that
compose Texan identity." Tex. H. Con. Res. 38, 77th Leg.
6473 (2001). But Texas, like our entire country, is now a
much more diversified community than it was when it
became a part of the United States or even when the
monument was erected. Today there are many Texans

———————

Though JUSTICE SCALIA disagrees that these sentiments are consistent
with the Establishment Clause, he does not deny that our cases whole-
heartedly adopt this expression of neutrality. Instead, he suggests that
this Court simply discard what he terms the "say-so of earlier Courts,"
based in part on his own "say-so" that nonmonotheists make up a
statistically insignificant portion of this Nation's religious community.
*McCreary County, post*, at 6. Besides marginalizing the belief systems
of more than 7 million Americans by deeming them unworthy of the
special protections he offers monotheists under the Establishment
Clause, JUSTICE SCALIA's measure of analysis may be cause for concern
even for the self-proclaimed "popular" religions of Islam and Judaism.
The number of Buddhists alone is nearly equal to the number of Mus-
lims in this country, and while those of the Islamic and Jewish faiths
only account for 2.2% of all believers, Christianity accounts for 95.5%.
See U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of
the United States: 2004–2005, p. 55 (124th ed. 2004) (Table No. 67).

who do not believe in the God whose Commandments are displayed at their seat of government. Many of them worship a different god or no god at all. Some may believe that the account of the creation in the Book of Genesis is less reliable than the views of men like Darwin and Einstein. The monument is no more an expression of the views of every true Texan than was the "Live Free or Die" motto that the State of New Hampshire placed on its license plates in 1969 an accurate expression of the views of every citizen of New Hampshire. See *Wooley* v. *Maynard,* 430 U. S. 705 (1977).

Recognizing the diversity of religious and secular beliefs held by Texans and by all Americans, it seems beyond peradventure that allowing the seat of government to serve as a stage for the propagation of an unmistakably Judeo-Christian message of piety would have the tendency to make nonmonotheists and nonbelievers "feel like [outsiders] in matters of faith, and [strangers] in the political community." *Pinette*, 515 U. S., at 799 (STEVENS, J., dissenting). "[D]isplays of this kind inevitably have a greater tendency to emphasize sincere and deeply felt differences among individuals than to achieve an ecumenical goal." *Allegheny County*, 492 U. S., at 651 (STEVENS, J., concurring in part and dissenting in part).[19]

Even more than the display of a religious symbol on government property, see *Pinette*, 515 U. S., at 797 (STEVENS, J., dissenting); *Allegheny County*, 492 U. S., at

_____

[19] The fact that this particular display has stood unchallenged for over forty years does not suggest otherwise. One need look no further than the deluge of cases flooding lower courts to realize the discord these displays have engendered. See, *e.g.*, *Mercier* v. *Fraternal Order of Eagles*, 395 F. 3d 693 (CA7 2005); *ACLU Nebraska Foundation* v. *Plattsmouth*, 358 F. 3d 1020 (CA8 2004); *Adland* v. *Russ*, 307 F. 3d 471 (CA6 2002); *Summum* v. *Ogden*, 297 F. 3d 995 (CA10 2002); *Books* v. *Elkhart*, 235 F. 3d 292 (CA7 2000); *State* v. *Freedom From Religion Foundation, Inc.,* 898 P. 2d 1013 (Colo. 1995); *Anderson* v. *Salt Lake City Corp.*, 475 F. 2d 29 (CA10 1973).

650–651 (STEVENS, J., concurring in part and dissenting in part), displaying this sectarian text at the state capitol should invoke a powerful presumption of invalidity. As JUSTICE SOUTER's opinion persuasively demonstrates, the physical setting in which the Texas monument is displayed—far from rebutting that presumption—actually enhances the religious content of its message. See *post*, at 6–8. The monument's permanent fixture at the seat of Texas government is of immense significance. The fact that a monument:

> "is installed on public property implies official recognition and reinforcement of its message. That implication is especially strong when the sign stands in front of the seat of government itself. The 'reasonable observer' of any symbol placed unattended in front of any capitol in the world will normally assume that the sovereign—which is not only the owner of that parcel of real estate but also the lawgiver for the surrounding territory—has sponsored and facilitated its message." *Pinette*, 515 U. S., at 801–802 (STEVENS, J., dissenting).

Critical examination of the Decalogue's prominent display at the seat of Texas government, rather than generic citation to the role of religion in American life, unmistakably reveals on which side of the "slippery slope," *ante*, at 8 (BREYER, J., concurring in judgment), this display must fall. God, as the author of its message, the Eagles, as the donor of the monument, and the State of Texas, as its proud owner, speak with one voice for a common purpose—to encourage Texans to abide by the divine code of a "Judeo-Christian" God. If this message is permissible, then the shining principle of neutrality to which we have long adhered is nothing more than mere shadow.

## III

The plurality relies heavily on the fact that our Republic was founded, and has been governed since its nascence, by leaders who spoke then (and speak still) in plainly religious rhetoric. THE CHIEF JUSTICE cites, for instance, George Washington's 1789 Thanksgiving Proclamation in support of the proposition that the Establishment Clause does not proscribe official recognition of God's role in our Nation's heritage, *ante*, at 7–8.[20] Further, the plurality emphatically endorses the seemingly timeless recognition that our "institutions presuppose a Supreme Being," *ante*, at 4. Many of the submissions made to this Court by the parties and *amici*, in accord with the plurality's opinion, have relied on the ubiquity of references to God throughout our history.

The speeches and rhetoric characteristic of the founding era, however, do not answer the question before us. I have already explained why Texas' display of the full text of the Ten Commandments, given the content of the actual display and the context in which it is situated, sets this case apart from the countless examples of benign government recognitions of religion. But there is another crucial difference. Our leaders, when delivering public addresses, often express their blessings simultaneously in the service of God and their constituents. Thus, when public officials deliver public speeches, we recognize that their words are not exclusively a transmission from *the* government because those oratories have embedded within them the

_____

[20] This is, of course, a rhetorical approach not unique to the plurality's opinion today. Appeals to such religious speeches have frequently been used in support of governmental transmission of religious messages. See, *e.g., Wallace*, 472 U. S., at 98–104 (REHNQUIST, J., dissenting); *Lee* v. *Weisman*, 505 U. S. 577, 633–636 (1992) (SCALIA, J., dissenting); *Santa Fe Independent School Dist.* v. *Doe*, 530 U. S. 290, 318 (2000) (REHNQUIST, C. J., dissenting); cf. *Lynch* v. *Donnelly*, 465 U. S. 668, 675–676 (1984).

inherently personal views of the speaker as an individual member of the polity.[21] The permanent placement of a textual religious display on state property is different in kind; it amalgamates otherwise discordant individual views into a collective statement of government approval. Moreover, the message never ceases to transmit itself to objecting viewers whose only choices are to accept the message or to ignore the offense by averting their gaze. Cf. *Allegheny County*, 492 U. S., at 664 (KENNEDY, J., concurring in judgment in part and dissenting in part); *ante*, at 4 (THOMAS, J., concurring). In this sense, although Thanksgiving Day proclamations and inaugural speeches undoubtedly seem official, in most circumstances they will not constitute the sort of governmental endorsement of religion at which the separation of church and state is aimed.[22]

The plurality's reliance on early religious statements and proclamations made by the Founders is also problematic because those views were not espoused at the Constitutional Convention in 1787[23] nor enshrined in the Consti-

---

[21] It goes without saying that the analysis differs when a listener is coerced into listening to a prayer. See, *e.g., Santa Fe Independent School Dist.,* 530 U. S., at 308–312.

[22] With respect to the "legislative prayers" cited approvingly by THE CHIEF JUSTICE, *ante*, at 8, I reiterate my view that "the designation of a member of one religious faith to serve as the sole official chaplain of a state legislature for a period of 16 years constitutes the preference of one faith over another in violation of the Establishment Clause." *Marsh* v. *Chambers*, 463 U. S. 783, 823 (1983) (STEVENS, J., dissenting). Thus, JUSTICE SCALIA and I are in agreement with respect to at least one point—this Court's decision in *Marsh* "ignor[ed] the neutrality principle" at the heart of the Establishment Clause. *McCreary County*, *post*, at 8 (SCALIA, J., dissenting).

[23] See, *e.g.,* J. Hutson, Religion and the Founding of the American Republic 75 (1998) (noting the dearth of references to God at the Philadelphia Convention and that many contemporaneous observers of the Convention complained that "the Framers had unaccountably turned their backs on the Almighty" because they "'found the Constitu-

tution's text. Thus, the presentation of these religious statements as a unified historical narrative is bound to paint a misleading picture. It does so here. In according deference to the statements of George Washington and John Adams, THE CHIEF JUSTICE and JUSTICE SCALIA, see *ante*, at 7 (plurality opinion); *McCreary County*, *post*, at 3–4 (dissenting opinion), fail to account for the acts and publicly espoused views of other influential leaders of that time. Notably absent from their historical snapshot is the fact that Thomas Jefferson refused to issue the Thanksgiving proclamations that Washington had so readily embraced based on the argument that to do so would violate the Establishment Clause.[24] THE CHIEF JUSTICE and JUSTICE SCALIA disregard the substantial debates that took place regarding the constitutionality of the early proclamations and acts they cite, see, *e.g.,* Letter from James Madison to Edward Livingston (July 10, 1822), in 5 The Founders' Constitution 105–106 (P. Kurland & R. Lerner eds. 1987) (hereinafter Founders' Constitution) (arguing that Congress' appointment of Chaplains to be paid from the National Treasury was "not with my approbation" and was a "deviation" from the principle of "immunity of Religion from civil jurisdiction"),[25] and paper

_____

tion without any acknowledgement of God'").

[24] See Letter from Thomas Jefferson to Rev. S. Miller (Jan. 23, 1808), in 5 Founders' Constitution 98; 11 Jefferson's Writings 428–430 (1905); see also *Lee*, 505 U. S., at 623–625 (SOUTER, J., concurring) (documenting history); *Lynch*, 465 U. S., at 716, n. 23 (Brennan, J., dissenting) (same).

[25] See also James Madison, Detached Memoranda, in 5 Founders' Constitution 103–104. Madison's letter to Livingston further argued that: "There has been another deviation from the strict principle in the Executive Proclamations of fasts & festivals, so far, at least, as they have spoken the language of *injunction*, or have lost sight of the equality of *all* religious sects in the eve of the Constitution. . . . Notwithstanding the general progress made within the last two centuries in favour of this branch of liberty, & the full establishment of it, in some

over the fact that Madison more than once repudiated the views attributed to him by many, stating unequivocally that with respect to government's involvement with religion, the "'tendency to a usurpation on one side, or the other, or to a corrupting coalition or alliance between them, will be best guarded against by an entire abstinence of the Government from interference, in any way whatever, beyond the necessity of preserving public order, & protecting each sect against trespasses on its legal rights by others.'"[26]

These seemingly nonconforming sentiments should come as no surprise. Not insignificant numbers of colonists came to this country with memories of religious persecution by monarchs on the other side of the Atlantic. See A. Stokes & L. Pfeffer, Church and State in the United States 3–23 (rev. ed. 1964). Others experienced religious intolerance at the hands of colonial Puritans, who regrettably failed to practice the tolerance that some of their contemporaries preached. *Engel* v. *Vitale*, 370 U. S. 421,

_____

parts of our Country, there remains in others a strong bias towards old error, that without some sort of alliance or coalition between [Government] & Religion neither can be duly supported. Such indeed is the tendency to such a coalition, and such its corrupting influence on both the parties, that the danger cannot be too carefully guarded [against]. . . . Every new & successful example therefore of a perfect separation between ecclesiastical and civil matters, is of importance. And I have no doubt that every new example, will succeed, as every past one has done, in shewing that religion & [Government] will both exist in greater purity, the less they are mixed together." *Id.*, at 105–106.

[26] Religion and Politics in the Early Republic 20–21 (D. Dreisbach ed. 1996) (hereinafter Dreisbach) (quoting Letter from James Madison to Jasper Adams (1833)). See also Letter from James Madison to Edward Livingston (July 10, 1822), in 5 Founders' Constitution 106 ("We are teaching the world the great truth that [Governments] do better without Kings & Nobles than with them. The merit will be doubled by the other lesson that Religion flourishes in greater purity, without than with the aid of [Government]").

427–429 (1962). THE CHIEF JUSTICE and JUSTICE SCALIA ignore the separationist impulses—in accord with the principle of "neutrality"—that these individuals brought to the debates surrounding the adoption of the Establishment Clause.[27]

Ardent separationists aside, there is another critical nuance lost in the plurality's portrayal of history. Simply put, many of the Founders who are often cited as authoritative expositors of the Constitution's original meaning understood the Establishment Clause to stand for a *narrower* proposition than the plurality, for whatever reason, is willing to accept. Namely, many of the Framers understood the word "religion" in the Establishment Clause to encompass only the various sects of Christianity.

The evidence is compelling. Prior to the Philadelphia Convention, the States had begun to protect "religious freedom" in their various constitutions. Many of those provisions, however, restricted "equal protection" and "free exercise" to Christians, and invocations of the divine were commonly understood to refer to Christ.[28] That historical background likely informed the Framers' understanding of

---

[27] The contrary evidence cited by THE CHIEF JUSTICE and JUSTICE SCALIA only underscores the obvious fact that leaders who have drafted and voted for a text are eminently capable of violating their own rules. The first Congress was—just as the present Congress is—capable of passing unconstitutional legislation. Thus, it is no answer to say that the Founders' separationist impulses were "plainly rejected" simply because the first Congress enacted laws that acknowledged God. See *McCreary County*, *post*, at 13 (SCALIA, J., dissenting). To adopt such an interpretive approach would misguidedly give authoritative weight to the fact that the Congress that passed the Fourteenth Amendment also enacted laws that tolerated segregation, and the fact that the Congress that passed the First Amendment also enacted laws, such as the Alien and Sedition Act, that indisputably violated our present understanding of the First Amendment. See n. 36, *infra*; *Lee*, 505 U. S., at 626 (SOUTER, J., concurring).

[28] See, *e.g.,* Strang, The Meaning of "Religion" in the First Amendment, 40 Duquesne L. Rev. 181, 220–223 (2002).

the First Amendment. Accordingly, one influential thinker wrote of the First Amendment that "'[t]he meaning of the term "establishment" in this amendment unquestionably is, the preference and establishment given by law to one sect of Christians over every other.'" Jasper Adams, The Relation of Christianity to Civil Government in the United States (Feb. 13, 1833) (quoted in Dreisbach 16). That definition tracked the understanding of the text Justice Story adopted in his famous Commentaries, in which he wrote that the "real object" of the Clause was:

> "not to countenance, much less to advance Mahometanism, or Judaism, or infidelity, by prostrating Christianity; but to exclude all rivalry among Christian sects, and to prevent any national ecclesiastical establishment, which should give to an hierarchy the exclusive patronage of the national government. It thus sought to cut off the means of religious persecution, (the vice and pest of former ages,) and the power of subverting the rights of conscience in matters of religion, which had been trampled upon almost from the days of the Apostles to the present age." 2 J. Story, Commentaries on the Constitution of the United States §991, p. 701 (R. Rotunda & J. Nowak eds. 1987) (hereinafter Story); see also *Wallace*, 472 U. S., at 52–55, and n. 36.[29]

Along these lines, for nearly a century after the Founding, many accepted the idea that America was not just a *reli-*

---

[29] Justice Story wrote elsewhere that "'Christianity is indispensable to the true interests & solid foundations of all free governments. I distinguish . . . between the establishment of a particular sect, as the Religion of the State, & the Establishment of Christianity itself, without any preference of any particular form of it. I know not, indeed, how any deep sense of moral obligation or accountableness can be expected to prevail in the community without a firm persuasion of the great Christian Truths." Letter to Jasper Adams (May 14, 1833) Dreisbach 19.

*gious* nation, but "a Christian nation." *Church of Holy Trinity* v. *United States,* 143 U. S. 457, 471 (1892).[30]

The original understanding of the type of "religion" that qualified for constitutional protection under the Establishment Clause likely did not include those followers of Judaism and Islam who are among the preferred "monotheistic" religions JUSTICE SCALIA has embraced in his *McCreary County* opinion. See *post*, at 10–11 (dissenting opinion).[31] The inclusion of Jews and Muslims inside the

—————

[30] See 143 U. S., at 471 ("'[W]e are a Christian people, and the morality of the country is deeply ingrafted upon Christianity, and not upon the doctrines or worship of . . . imposters'" (quoting *People* v. *Ruggles*, 8 Johns. 290, 295 (N. Y. Sup. Ct. 1811))); see also *Vidal* v. *Philadelphia,* 2 How. 127, 198–199 (1844). These views should not be read as those of religious zealots. Chief Justice Marshall himself penned the historical genesis of the Court's assertion that our "'institutions presuppose a Supreme Being,'" see *Zorach*, 343 U. S., at 313, writing that the "American population is entirely Christian, & with us, Christianity & Religion are identified. It would be strange, indeed, if with such a people, our institutions did not presuppose Christianity, & did not often refer to it, & exhibit relations with it." Letter from John Marshall to Jasper Adams (May 9, 1833) (quoted in Dreisbach 18–19). Accord, Story §988, p. 700 ("[A]t the time of the adoption of the constitution, . . . the general, if not the universal, sentiment in America was, that Christianity ought to receive encouragement from the state . . ." (footnote omitted)).

[31] JUSTICE SCALIA's characterization of this conclusion as nothing more than my own personal "assurance" is misleading to say the least. *McCreary County*, *post*, at 13. Reliance on our Nation's early constitutional scholars is common in this Court's opinions. In particular, the author of the plurality once noted that "Joseph Story, a Member of this Court from 1811 to 1845, and during much of that time a professor at the Harvard Law School, published by far the most comprehensive treatise on the United States Constitution that had then appeared." *Wallace*, 472 U. S., at 104 (REHNQUIST, J., dissenting). And numerous opinions of this Court, including two notable opinions authored by JUSTICE SCALIA, have seen it fit to give authoritative weight to Joseph Story's treatise when interpreting other constitutional provisions. See, *e.g., United States* v. *Gaudin*, 515 U. S. 506, 510–511 (1995) (Fifth Amendment); *Harmelin* v. *Michigan*, 501 U. S. 957, 981–982 (1991) (Eighth Amendment).

category of constitutionally favored religions surely would have shocked Chief Justice Marshall and Justice Story. Indeed, JUSTICE SCALIA is unable to point to any persuasive historical evidence or entrenched traditions in support of his decision to give specially preferred constitutional status to all monotheistic religions. Perhaps this is because the history of the Establishment Clause's original meaning just as strongly supports a preference for Christianity as it does a preference for monotheism. Generic references to "God" hardly constitute evidence that those who spoke the word meant to be inclusive of all monotheistic believers; nor do such references demonstrate that those who heard the word spoken understood it broadly to include all monotheistic faiths. See *supra*, at 21. JUSTICE SCALIA's inclusion of Judaism and Islam is a laudable act of religious tolerance, but it is one that is unmoored from the Constitution's history and text, and moreover one that is patently arbitrary in its inclusion of some, but exclusion of other (*e.g.*, Buddhism), widely practiced non-Christian religions. See *supra*, at 12, 13–14, and n. 16 (noting that followers of Buddhism nearly equal the number of Americans who follow Islam). Given the original understanding of the men who championed our "Christian nation"—men who had no cause to view anti-Semitism or contempt for atheists as problems worthy of civic concern—one must ask whether JUSTICE SCALIA "has not had the courage (or the foolhardiness) to apply [his originalism] principle consistently." *McCreary County, post*, at 7.

Indeed, to constrict narrowly the reach of the Establishment Clause to the views of the Founders would lead to more than this unpalatable result; it would also leave us with an unincorporated constitutional provision—in other words, one that limits only the *federal* establishment of "a national religion." See *Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1, 45 (2004) (THOMAS, J., concurring in judgment); cf. A. Amar, The Bill of Rights 36–39

(1998). Under this view, not only could a State constitutionally adorn all of its public spaces with crucifixes or passages from the New Testament, it would also have full authority to prescribe the teachings of Martin Luther or Joseph Smith as *the* official state religion. Only the Federal Government would be prohibited from taking sides, (and only then as between Christian sects).

A reading of the First Amendment dependent on either of the purported original meanings expressed above would eviscerate the heart of the Establishment Clause. It would replace Jefferson's "wall of separation" with a perverse wall of exclusion—Christians inside, non-Christians out. It would permit States to construct walls of their own choosing—Baptists inside, Mormons out; Jewish Orthodox inside, Jewish Reform out. A Clause so understood might be faithful to the expectations of some of our Founders, but it is plainly not worthy of a society whose enviable hallmark over the course of two centuries has been the continuing expansion of religious pluralism and tolerance. Cf. *Abington*, 374 U. S., at 214; *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 720, 723 (2002) (BREYER, J., dissenting).

Unless one is willing to renounce over 65 years of Establishment Clause jurisprudence and cross back over the incorporation bridge, see *Cantwell* v. *Connecticut*, 310 U. S. 296, 303 (1940), appeals to the religiosity of the Framers ring hollow.[32] But even if there were a coherent

---

[32] JUSTICE SCALIA's answer—that incorporation does not empty "the incorporated provisions of their original meaning," *McCreary County*, *post*, at 15—ignores the fact that the Establishment Clause has its own unique history. There is no evidence, for example, that incorporation of the Confrontation Clause ran contrary to the core of the Clause's original understanding. There is, however, some persuasive evidence to this effect regarding the Establishment Clause. See *Elk Grove Unified School Dist.* v. *Newdow,* 542 U. S. 1, 49 (2004) (THOMAS, J., concurring in judgment) (arguing that the Clause was originally understood to be a "federalism provision" intended to prevent "Congress from interfering with state establishments"). It is this unique history, not incorporation

way to embrace incorporation with one hand while stead-
fastly abiding by the Founders' purported religious views
on the other, the problem of the selective use of history
remains. As the widely divergent views espoused by the
leaders of our founding era plainly reveal, the historical
record of the preincorporation Establishment Clause is too
indeterminate to serve as an interpretive North Star.[33]

It is our duty, therefore, to interpret the First Amend-
ment's command that "Congress shall make no law re-
specting an establishment of religion" not by merely ask-
ing what those words meant to observers at the time of the
founding, but instead by deriving from the Clause's text
and history the broad principles that remain valid today.
As we have said in the context of statutory interpretation,
legislation "often [goes] beyond the principal evil [at which
the statute was aimed] to cover reasonably comparable
evils, and it is ultimately the provisions of our laws rather
than the principal concerns of our legislators by which we

---

writ large, that renders incoherent the postincorporation reliance on
the Establishment Clause's original understanding.

JUSTICE THOMAS, at least, has faced this problem head-on. See *id.*, at
45 (opinion concurring in judgment). But even if the decision to incor-
porate the Establishment Clause was misguided, it is at this point
unwise to reverse course given the weight of precedent that would have
to be cast aside to reach the intended result. See Cardozo, The Nature
of the Judicial Process 149 (1937) ("The labor of judges would be in-
creased almost to the breaking point if every past decision could be
reopened in every case").

[33] See *Lee*, 505 U. S., at 626 (SOUTER, J., concurring) ("[A]t best, . . .
the Framers simply did not share a common understanding of the
Establishment Clause," and at worst, their overtly religious proclama-
tions show "that they . . . could raise constitutional ideals one day and
turn their backs on them the next"); *Lynch* v. *Donnelly*, 465 U. S. 668,
716 (1984) (Brennan, J., dissenting) (same); cf. Feldman, Intellectual
Origins of the Establishment Clause, 77 N. Y. U. L. Rev. 346, 404–405
(2002) (noting that, for the Framers, "the term 'establishment' was a
contested one" and that the word "was used in both narrow and expan-
sive ways in the debates of the time").

are governed." *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75, 79 (1998). In similar fashion, we have construed the Equal Protection Clause of the Fourteenth Amendment to prohibit segregated schools, see *Brown* v. *Board of Education*, 349 U. S. 294 (1955), even though those who drafted that Amendment evidently thought that separate was not unequal.[34] We have held that the same Amendment prohibits discrimination against individuals on account of their gender, *Frontiero* v. *Richardson*, 411 U. S. 677 (1973), despite the fact that the contemporaries of the Amendment "doubt[ed] very much whether any action of a State not directed by way of discrimination against the negroes as a class, or on account of their race, will ever be held to come within the purview of this provision," *Slaughter-House Cases,* 16 Wall. 36, 81 (1873). And we have construed "evolving standards of decency" to make impermissible practices that were not considered "cruel and unusual" at the founding. See *Roper* v. *Simmons*, 543 U. S. \_\_\_, \_\_\_ (2005) (slip op., at 1) (STEVENS, J., concurring).

  To reason from the broad principles contained in the Constitution does not, as JUSTICE SCALIA suggests, require us to abandon our heritage in favor of unprincipled expressions of personal preference. The task of applying the broad principles that the Framers wrote into the text of the First Amendment is, in any event, no more a matter of personal preference than is one's selection between two (or more) sides in a heated historical debate. We serve our constitutional mandate by expounding the meaning of

—————

[34] See Hovenkamp, The Cultural Crises of the Fuller Court, 104 Yale L. J. 2309, 2337–2342 (1995) ("Equal protection had not been identified with social integration when the Fourteenth Amendment was drafted in 1866, nor when it was ratified in 1868, nor when *Plessy* [v. *Ferguson*, 163 U. S. 537] was decided in 1896"); see also 1 L. Tribe, American Constitutional Law §1–14, pp. 54–55, and n. 19 (3d ed. 2000) (collecting scholarship).

constitutional provisions with one eye towards our Nation's history and the other fixed on its democratic aspirations. See *McCulloch* v. *Maryland,* 4 Wheat. 316, 407, 415 (1819) ("[W]e must never forget, that it is *a constitution* we are expounding" that is intended to "endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs"). Constitutions, after all,

> "are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice Marshall, 'designed to approach immortality as nearly as human institutions can approach it.' The future is their care and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution, therefore, our contemplation cannot be only of what has been but of what may be. Under any other rule a constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value and be converted by precedent into impotent and lifeless formulas." *Weems* v. *United States*, 217 U. S. 349, 373 (1910).

The principle that guides my analysis is neutrality.[35]

---

[35] JUSTICE THOMAS contends that the Establishment Clause cannot include such a neutrality principle because the Clause reaches only the governmental coercion of individual belief or disbelief. *Ante*, at 4 (concurring opinion). In my view, although actual religious coercion is undoubtedly forbidden by the Establishment Clause, that cannot be the full extent of the provision's reach. Jefferson's "wall" metaphor and his refusal to issue Thanksgiving proclamations, see *supra,* at 19, would have been nonsensical if the Clause reached only direct coercion. Further, under the "coercion" view, the Establishment Clause would amount to little more than a replica of our compelled speech doctrine, see, *e.g., West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 639 (1943), with a religious flavor. A Clause so interpreted would not prohibit explicit state endorsements of religious orthodoxies of particular sects, actions that lie at the heart of what the Clause was meant to regulate. The government could, for example, take out television advertisements

The basis for that principle is firmly rooted in our Nation's history and our Constitution's text. I recognize that the requirement that government must remain neutral between religion and irreligion would have seemed foreign to some of the Framers; so too would a requirement of neutrality between Jews and Christians. But cf. Letter from George Washington to the Hebrew Congregation in Newport, R. I. (Aug. 18, 1790), in 6 Papers of George Washington 284, 285 (D. Twohig ed. 1996). Fortunately, we are not bound by the Framers' expectations—we are bound by the legal principles they enshrined in our Constitution. Story's vision that States should not discriminate between Christian sects has as its foundation the principle that government must remain neutral between valid systems of belief. As religious pluralism has expanded, so has our acceptance of what constitutes valid belief systems. The evil of discriminating today against atheists, "polytheists[,]

------

lauding Catholicism as the only pure religion. Under the reasoning endorsed by JUSTICE THOMAS, those programs would not be coercive because the viewer could simply turn off the television or ignore the ad. See *ante*, at 3 ("[T]he mere presence of the monument . . . involves no coercion" because the passerby "need not stop to read it or even to look at it").

Further, the notion that the application of a "coercion" principle would somehow lead to a more consistent jurisprudence is dubious. Enshrining coercion as the Establishment Clause touchstone fails to eliminate the difficult judgment calls regarding "the form that coercion must take." *McCreary County*, *post*, at 25 (SCALIA, J., dissenting). Coercion may seem obvious to some, while appearing nonexistent to others. Compare *Santa Fe Independent School Dist.*, 530 U. S., at 312, with *Lee*, 505 U. S., at 642 (SCALIA, J., dissenting). It may be a legal requirement or an effect that is indirectly inferred from a variety of factors. See, *e.g., Engel* v. *Vitale*, 370 U. S. 421, 431 (1962) ("When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain"). In short, "reasonable people could, and no doubt would, argue about whether coercion existed in a particular situation." Feldman, The Intellectual Origins of the Establishment Clause, 77 N. Y. U. L. Rev. 346, 415 (2002).

and believers in unconcerned deities," *McCreary County*, *post*, at 10 (SCALIA, J., dissenting), is in my view a direct descendent of the evil of discriminating among Christian sects. The Establishment Clause thus forbids it and, in turn, forbids Texas from displaying the Ten Commandments monument the plurality so casually affirms.

## IV

The Eagles may donate as many monuments as they choose to be displayed in front of Protestant churches, benevolent organizations' meeting places, or on the front lawns of private citizens. The expurgated text of the King James version of the Ten Commandments that they have crafted is unlikely to be accepted by Catholic parishes, Jewish synagogues, or even some Protestant denominations, but the message they seek to convey is surely more compatible with church property than with property that is located on the government side of the metaphorical wall.

The judgment of the Court in this case stands for the proposition that the Constitution permits governmental displays of sacred religious texts. This makes a mockery of the constitutional ideal that government must remain neutral between religion and irreligion. If a State may endorse a particular deity's command to "have no other gods before me," it is difficult to conceive of any textual display that would run afoul of the Establishment Clause.

The disconnect between this Court's approval of Texas's monument and the constitutional prohibition against preferring religion to irreligion cannot be reduced to the exercise of plotting two adjacent locations on a slippery slope. Cf. *ante*, at 8 (BREYER, J., concurring in judgment). Rather, it is the difference between the shelter of a fortress and exposure to "the winds that would blow" if the wall were allowed to crumble. See *TVA* v. *Hill,* 437 U. S. 153, 195 (1978) (internal quotation marks omitted). That wall, however imperfect, remains worth preserving.

I respectfully dissent.



# SUPREME COURT OF THE UNITED STATES

––––––––––

No. 03–1500

––––––––––

## THOMAS VAN ORDEN, PETITIONER *v.* RICK PERRY, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS AND CHAIRMAN, STATE PRESERVATION BOARD, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2005]

JUSTICE O'CONNOR, dissenting.

For essentially the reasons given by JUSTICE SOUTER, *post,* p.___ (dissenting opinion), as well as the reasons given in my concurrence in *McCreary County* v. *American Civil Liberties Union of Ky., post,* at ___, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 03–1500

_____

THOMAS VAN ORDEN, PETITIONER *v.* RICK PERRY,
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS
AND CHAIRMAN, STATE PRESERVATION
BOARD, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2005]

JUSTICE SOUTER, with whom JUSTICE STEVENS and
JUSTICE GINSBURG join, dissenting.

Although the First Amendment's Religion Clauses have
not been read to mandate absolute governmental neutral-
ity toward religion, cf. *Sherbert* v. *Verner*, 374 U. S. 398
(1963), the Establishment Clause requires neutrality as a
general rule, *e.g.*, *Everson* v. *Board of Ed. of Ewing*, 330
U. S. 1, 18 (1947), and thus expresses Madison's condem-
nation of "employ[ing] Religion as an engine of Civil pol-
icy," Memorial and Remonstrance Against Religious As-
sessments, 2 Writings of James Madison 183, 187 (G.
Hunt ed. 1901). A governmental display of an obviously
religious text cannot be squared with neutrality, except in
a setting that plausibly indicates that the statement is not
placed in view with a predominant purpose on the part of
government either to adopt the religious message or to
urge its acceptance by others.

Until today, only one of our cases addressed the consti-
tutionality of posting the Ten Commandments, *Stone* v.
*Graham*, 449 U. S. 39, 41–42 (1980) *(per curiam)*. A Ken-
tucky statute required posting the Commandments on the
walls of public school classrooms, and the Court described
the State's purpose (relevant under the tripartite test laid

out in *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971)) as being at odds with the obligation of religious neutrality.

> "The pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact. The Commandments do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness. Rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day." 449 U. S, at 41–42 (footnote and citations omitted).

What these observations underscore are the simple realities that the Ten Commandments constitute a religious statement, that their message is inherently religious, and that the purpose of singling them out in a display is clearly the same.[1]

———————

[1] The clarity of the religious manifestation in *Stone* was unaffected by the State's effort to obscure it: the Kentucky statute that mandated posting the Commandments in classrooms also required the addition to every posting of a notation reading, "[t]he secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." 449 U. S., at 39–40, n. 1.

In the present case, the religious purpose was evident on the part of the donating organization. When the Fraternal Order of Eagles, the group that gave the monument to the State of Texas, donated identical monuments to other jurisdictions, it was seeking to impart a religious message. See *Adland* v. *Russ*, 307 F. 3d 471, 475 (CA6 2002) (quoting the Eagles' statement in a letter written to Kentucky when a monument was donated to that Commonwealth: "Most of today's younger generation either have not seen the Ten Commandments or have not

Thus, a pedestrian happening upon the monument at issue here needs no training in religious doctrine to realize that the statement of the Commandments, quoting God himself, proclaims that the will of the divine being is the source of obligation to obey the rules, including the facially secular ones. In this case, moreover, the text is presented to give particular prominence to the Commandments' first sectarian reference, "I am the Lord thy God." That proclamation is centered on the stone and written in slightly larger letters than the subsequent recitation. To ensure that the religious nature of the monument is clear to even the most casual passerby, the word "Lord" appears in all capital letters (as does the word "am"), so that the most eye-catching segment of the quotation is the declaration "I AM the LORD thy God." App. to Pet. for Cert. 21. What follows, of course, are the rules against other gods, graven images, vain swearing, and Sabbath breaking. And the full text of the fifth Commandment puts forward filial respect as a condition of long life in the land "which the Lord thy God giveth thee." See *ibid.* These "[w]ords . . . make [the] . . . religious meaning unmistakably clear." *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 598 (1989).

To drive the religious point home, and identify the message as religious to any viewer who failed to read the text, the engraved quotation is framed by religious symbols: two tablets with what appears to be ancient script on them, two Stars of David, and the superimposed Greek

_____

been taught them. In our opinion the youth of today is in dire need of learning the simple laws of God . . ."). Accordingly, it was not just the terms of the moral code, but the proclamation that the terms of the code were enjoined by God, that the Eagles put forward in the monuments they donated.

letters Chi and Rho as the familiar monogram of Christ. Nothing on the monument, in fact, detracts from its religious nature,[2] see *ibid.* ("Here, unlike in *Lynch* [v. *Donnelly*, 465 U. S. 668 (1984)], nothing in the context of the display detracts from the crèche's religious message"), and the plurality does not suggest otherwise. It would therefore be difficult to miss the point that the government of Texas[3] is telling everyone who sees the monument to live up to a moral code because God requires it, with both code and conception of God being rightly understood as the inheritances specifically of Jews and Christians. And it is likewise unsurprising that the District Court expressly rejected Texas's argument that the State's purpose in placing the monument on the capitol grounds was related to the Commandments' role as "part of the foundation of modern secular law in Texas and elsewhere." App. to Pet. for Cert. 32.

The monument's presentation of the Commandments with religious text emphasized and enhanced stands in contrast to any number of perfectly constitutional depic-

_____

[2] That the monument also surrounds the text of the Commandments with various American symbols (notably the U. S. flag and a bald eagle) only underscores the impermissibility of Texas's actions: by juxtaposing these patriotic symbols with the Commandments and other religious signs, the monument sends the message that being American means being religious (and not just being religious but also subscribing to the Commandments, *i.e.,* practicing a monotheistic religion).

[3] There is no question that the State in its own right is broadcasting the religious message. When Texas accepted the monument from the Eagles, the state legislature, aware that the Eagles "for the past several years have placed across the country . . . parchment plaques and granite monoliths of the Ten Commandments . . . [in order] to promote youth morality and help stop the alarming increase in delinquency," resolved "that the Fraternal Order of the Eagles of the State of Texas be commended and congratulated for its efforts and contributions in combating juvenile delinquency throughout our nation." App. 97. The State, then, expressly approved of the Eagles' proselytizing, which it made on its own.

tions of them, the frieze of our own Courtroom providing a good example, where the figure of Moses stands among history's great lawgivers. While Moses holds the tablets of the Commandments showing some Hebrew text, no one looking at the lines of figures in marble relief is likely to see a religious purpose behind the assemblage or take away a religious message from it. Only one other depiction represents a religious leader, and the historical personages are mixed with symbols of moral and intellectual abstractions like Equity and Authority. See *County of Allegheny*, *supra*, at 652 (STEVENS, J., concurring in part and dissenting in part). Since Moses enjoys no especial prominence on the frieze, viewers can readily take him to be there as a lawgiver in the company of other lawgivers; and the viewers may just as naturally see the tablets of the Commandments (showing the later ones, forbidding things like killing and theft, but without the divine preface) as background from which the concept of law emerged, ultimately having a secular influence in the history of the Nation. Government may, of course, constitutionally call attention to this influence, and may post displays or erect monuments recounting this aspect of our history no less than any other, so long as there is a context and that context is historical. Hence, a display of the Commandments accompanied by an exposition of how they have influenced modern law would most likely be constitutionally unobjectionable.[4] And the Decalogue could, as

_____

[4] For similar reasons, the other displays of the Commandments that the plurality mentions, *ante*, at 9, do not run afoul of the Establishment Clause. The statues of Moses and St. Paul in the Main Reading Room of the Library of Congress are 2 of 16 set in close proximity, statues that "represent men illustrious in the various forms of thought and activity . . . ." The Library of Congress: The Art and Architecture of the Thomas Jefferson Building 127 (J. Cole and H. Reeds eds. 1997). Moses and St. Paul represent religion, while the other 14 (a group that includes Beethoven, Shakespeare, Michelangelo, Columbus, and Plato) represent the nonreligious categories of philosophy, art, history, com-

*Stone* suggested, be integrated constitutionally into a course of study in public schools. *Stone,* 449 U. S*.,* at 42.[5]

Texas seeks to take advantage of the recognition that visual symbol and written text can manifest a secular purpose in secular company, when it argues that its monument (like Moses in the frieze) is not alone and ought to be viewed as only 1 among 17 placed on the 22 acres surrounding the state capitol. Texas, indeed, says that the Capitol grounds are like a museum for a collection of

––––––––––

merce, science, law, and poetry. *Ibid.* Similarly, the sculpture of the woman beside the Decalogue in the Main Reading Room is one of 8 such figures "represent[ing] eight characteristic features of civilized life and thought," the same 8 features (7 of them nonreligious) that Moses, St. Paul, and the rest of the 16 statues represent. *Id.*, at 125.

The inlay on the floor of the National Archives Building is one of four such discs, the collective theme of which is not religious. Rather, the discs "symbolize the various types of Government records that were to come into the National Archive." Letter from Judith A. Koucky, Archivist, Records Control Section to Catherine Millard, Oct. 1, 2003 (on file with Clerk of the Court). (The four categories are war and defense, history, justice, and legislation. Each disc is paired with a winged figure; the disc containing the depiction of the Commandments, a depiction that, notably, omits the Commandments' text, is paired with a figure representing legislation. *Ibid.*)

As for Moses's "prominen[t] featur[ing] in the Chamber of the United States House of Representatives," *ante,* at 9 (plurality opinion), Moses is actually 1 of 23 portraits encircling the House Chamber, each approximately the same size, having no religious theme. The portraits depict "men noted in history for the part they played in the evolution of what has become American law." Art in the United States Capitol 282; House Doc. No. 94–660 (1978). More importantly for purposes of this case, each portrait consists only of the subject's face; the Ten Commandments appear nowhere in Moses's portrait.

[5] Similarly permissible, though obviously of a different character, are laws that can be traced back to the Commandments (even the more religious ones) but are currently supported by nonreligious considerations. See *McCreary County* v. *American Civil Liberties Union of Ky., post*, at 10 (opinion of the Court) (noting that in *McGowan* v. *Maryland,* 366 U. S. 420 (1961), the Court "upheld Sunday closing laws on practical secular grounds after finding that the government had forsaken the religious purposes motivating centuries-old predecessor laws").

exhibits, the kind of setting that several Members of the Court have said can render the exhibition of religious artifacts permissible, even though in other circumstances their display would be seen as meant to convey a religious message forbidden to the State. *County of Allegheny,* 492 U. S.*,* at 595 (opinion of Blackmun, J., joined by STEVENS, J.); *Lynch* v. *Donnelly*, 465 U. S. 668, 692 (1984) (O'CONNOR, J., concurring). So, for example, the Government of the United States does not violate the Establishment Clause by hanging Giotto's Madonna on the wall of the National Gallery.

But 17 monuments with no common appearance, history, or esthetic role scattered over 22 acres is not a museum, and anyone strolling around the lawn would surely take each memorial on its own terms without any dawning sense that some purpose held the miscellany together more coherently than fortuity and the edge of the grass. One monument expresses admiration for pioneer women. One pays respect to the fighters of World War II. And one quotes the God of Abraham whose command is the sanction for moral law. The themes are individual grit, patriotic courage, and God as the source of Jewish and Christian morality; there is no common denominator. In like circumstances, we rejected an argument similar to the State's, noting in *County of Allegheny* that "[t]he presence of Santas or other Christmas decorations elsewhere in the . . . [c]ourthouse, and of the nearby gallery forum, fail to negate the [crèche's] endorsement effect. . . . The record demonstrates . . . that the crèche, with its floral frame, was its own display distinct from any other decorations or exhibitions in the building." 492 U. S., at 598–599, n. 48.[6]

––––––––––

[6] It is true that the Commandments monument is unlike the display of the Commandments considered in the other Ten Commandments case we decide today, *McCreary County*. There the Commandments were posted at the behest of the county in the first instance, whereas the State of Texas received the monument as a gift from the Eagles,

If the State's museum argument does nothing to blunt the religious message and manifestly religious purpose behind it, neither does the plurality's reliance on generalities culled from cases factually different from this one. *E.g., ante,* at 8 ("We have acknowledged, for example, that 'religion has been closely identified with our history and government,' *School Dist. of Abington Township* v. *Schempp,* 374 U. S., at 212, and that '[t]he history of man is inseparable from the history of religion,' *Engel* v. *Vitale,* 370 U. S. 421, 434 (1962)"). In fact, it is not until the end of its opinion that the plurality turns to the relevant precedent of *Stone*, a case actually dealing with a display of the Decalogue.

When the plurality finally does confront *Stone,* it tries to avoid the case's obvious applicability by limiting its holding to the classroom setting. The plurality claims to find authority for limiting *Stone*'s reach this way in the opinion's citations of two school-prayer cases, *School Dist. of Abington Township* v. *Schempp,* 374 U. S. 203 (1963), and *Engel* v. *Vitale,* 370 U. S. 421 (1962). But *Stone* relied on those cases for widely applicable notions, not for any concept specific to schools. The opinion quoted *Schempp*'s statements that "it is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment," *Schempp, supra,* at 225, quoted in *Stone,* 449 U. S*.,* at 42; and that "the place of the Bible as

———————

which apparently conceived of the donation at the suggestion of a movie producer bent on promoting his commercial film on the Ten Commandments, *Books* v. *Elkhart*, 235 F. 3d 292, 294–295 (CA7 2000), cert. denied, 532 U. S. 1058 (2001). But this distinction fails to neutralize the apparent expression of governmental intent to promote a religious message: although the nativity scene in *Allegheny County* was donated by the Holy Name Society, we concluded that "[n]o viewer could reasonably think that [the scene] occupies [its] location [at the seat of county government] without the support and approval of the government." *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 599–600 (1989).

an instrument of religion cannot be gainsaid," *Schempp, supra,* at 224, quoted in *Stone, supra,* at 41, n. 3. And *Engel* was cited to support the proposition that the State was responsible for displaying the Commandments, even though their framed, printed texts were bought with private subscriptions. *Stone*, *supra*, at 42 ("[T]he mere posting of the [Commandments] under the auspices of the legislature provides the official support of the State Government that the Establishment Clause prohibits" (omission and internal quotation marks omitted)). Thus, the schoolroom was beside the point of the citations, and that is presumably why the *Stone* Court failed to discuss the educational setting, as other opinions had done when school was significant. *E.g., Edwards* v. *Aguillard,* 482 U. S. 578, 584 (1987). *Stone* did not, for example, speak of children's impressionability or their captivity as an audience in a school class. In fact, *Stone*'s reasoning reached the classroom only in noting the lack of support for the claim that the State had brought the Commandments into schools in order to "integrat[e] [them] into the school curriculum." 449 U. S*.,* at 42. Accordingly, our numerous prior discussions of *Stone* have never treated its holding as restricted to the classroom.[7]

Nor can the plurality deflect *Stone* by calling the Texas monument "a far more passive use of [the Decalogue] than was the case in *Stone,* where the text confronted elementary school students every day." *Ante,* at 12. Placing a monument on the ground is not more "passive" than hang-

---

[7] In any event, the fact that we have been, as the plurality says, "particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools," *ante,* at 11, does not of course mean that anything goes outside the schoolhouse. As cases like *County of Allegheny* and *Lynch* v. *Donnelly,* 465 U. S. 668 (1984), illustrate, we have also closely scrutinized government displays of religious symbols. And for reasons discussed in the text, the Texas monument cannot survive even a relaxed level of scrutiny.

ing a sheet of paper on a wall when both contain the same
text to be read by anyone who looks at it.  The problem in
*Stone* was simply that the State was putting the Com-
mandments there to be seen, just as the monument's
inscription is there for those who walk by it.

To be sure, Kentucky's compulsory-education law meant
that the schoolchildren were forced to see the display
every day, whereas many see the monument by choice,
and those who customarily walk the Capitol grounds can
presumably avoid it if they choose.  But in my judgment
(and under our often inexact Establishment Clause juris-
prudence, such matters often boil down to judgment, see
*ante*, at 3–4 (BREYER, J., concurring in judgment)), this
distinction should make no difference.  The monument in
this case sits on the grounds of the Texas State Capitol.
There is something significant in the common term "state-
house" to refer to a state capitol building: it is the civic
home of every one of the State's citizens.  If neutrality in
religion means something, any citizen should be able to
visit that civic home without having to confront religious
expressions clearly meant to convey an official religious
position that may be at odds with his own religion, or with
rejection of religion.  See *County of Allegheny*, 492 U. S., at
626 (O'CONNOR, J., concurring in part and concurring in
judgment) ("I agree that the crèche displayed on the
Grand Staircase of the Allegheny County Courthouse, the
seat of county government, conveys a message to nonad-
herents of Christianity that they are not full members of
the political community . . . .  The display of religious
symbols in public areas of core government buildings runs
a special risk of making religion relevant, in reality or
public perception, to status in the political community"
(alteration and internal quotation marks omitted)).

Finally, though this too is a point on which judgment
will vary, I do not see a persuasive argument for constitu-
tionality in the plurality's observation that Van Orden's

lawsuit comes "[f]orty years after the monument's erection . . . ," a*nte,* at 2, an observation that echoes the State's contention that one fact cutting in its favor is that "the monument stood . . . in Austin . . . for some forty years without generating any controversy or litigation," Brief for Respondents 25. It is not that I think the passage of time is necessarily irrelevant in Establishment Clause analysis. We have approved framing-era practices because they must originally have been understood as constitutionally permissible, *e.g.*, *Marsh* v. *Chambers*, 463 U. S. 783 (1983) (legislative prayer), and we have recognized that Sunday laws have grown recognizably secular over time, *McGowan* v. *Maryland,* 366 U. S. 420 (1961). There is also an analogous argument, not yet evaluated, that ritualistic religious expression can become so numbing over time that its initial Establishment Clause violation becomes at some point too diminished for notice. But I do not understand any of these to be the State's argument, which rather seems to be that 40 years without a challenge shows that as a factual matter the religious expression is too tepid to provoke a serious reaction and constitute a violation. Perhaps, but the writer of Exodus chapter 20 was not lukewarm, and other explanations may do better in accounting for the late resort to the courts. Suing a State over religion puts nothing in a plaintiff's pocket and can take a great deal out, and even with volunteer litigators to supply time and energy, the risk of social ostracism can be powerfully deterrent. I doubt that a slow walk to the courthouse, even one that took 40 years, is much evidentiary help in applying the Establishment Clause.

I would reverse the judgment of the Court of Appeals.